# EXHIBIT A

Helen Setton, Esq. (078942014)
**Andrew T. Miltenberg, Esq.** *(pro hac vice pending)*
**Gabrielle M. Vinci, Esq.** *(pro hac vice pending)*
**Jordan Tuchman, Esq.** *(pro hac vice pending)*
**NESENOFF & MILTENBERG, LLP.**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**Tel: 212-736-4500**
*Attorneys for Plaintiffs*

---------------------------------------------------------------------X

**THE ESTATE OF KRISTEN MCCARTNEY, DONNA DOCKERY, and SEAN MCCARTNEY,**

              **Plaintiffs,**

       **-against-**

**SETON HALL UNIVERSITY, THE SETON HALL UNIVERSITY BOARD OF TRUSTEES, THE SETON HALL UNIVERSITY BOARD OF REGENTS, JOSEPH W. TOBIN, JOSEPH E. NYRE, DIANE LYNCH, and JOHN DOE,**

             **Defendants.**

---------------------------------------------------------------------X

**SUPERIOR COURT OF NEW JERSEY**

**LAW DIVISION: ESSEX COUNTY**

**DOCKET NO.:**

Civil Action

**COMPLAINT WITH JURY DEMAND**

Plaintiffs Donna Dockery and Sean McCartney, individually and on behalf of Plaintiff The Estate of Kristen McCartney, deceased, by and through their attorneys, Nesenoff & Miltenberg, LLP, respectfully bring suit against Seton Hall University, the Seton Hall University Board of Regents, the Seton Hall University Board of Trustees, Joseph W. Tobin, Joseph E. Nyre, Diane Lynch, and John Doe, alleging as follows:

## **INTRODUCTION**

1.    This action stems from the tragic and entirely avoidable death of Kristen McCartney ("Kristen") after being forced by Seton Hall University ("Seton Hall" or the "University") into mandatory COVID-19 isolation, alone in a dormitory room of their choosing, without any care or

1

attention to Kristen's COVID-19 diagnosis, or her disability which was known to Defendants, that caused her to have a debilitating seizure, resulting in her death.

2.      Defendants had actual and constructive notice that Kristen was a student at Seton Hall with a seizure disability. Kristen's Epilepsy disorder was diagnosed many years prior, in 2011 when she was in the third grade, and Kristen's parents made the University aware of her condition numerous times when she arrived to live in on-campus housing in the Fall of 2020.

3.      Kristen also informed the University numerous times of her Epilepsy, including on a medical form she filled out with the school, and through extensive discussions with school personnel when she applied to be a member of the soccer team, and received medical screening by the University. Kristen was rejected from participation on Seton Hall's soccer team presumably due to her disability.

4.      It is well documented that Kristen tended to have at least two (2) seizures per year, and thus it was reasonable and foreseeable that she could have seizures at any time while living on campus at Seton Hall, whether she was in class, in the dormitory, or elsewhere on campus. In fact, Kristen had two (2) seizures while at Seton Hall, on December 1, 2020 and January 31, 2021. Even despite these facts, the University failed to establish a plan for Kristen to address the serious threat to her health and safety posed by her seizure disorder.

5.      Moreover, when Kristen tested positive for COVID-19, the Defendants forced her to move from her regular dormitory, pursuant to their own COVID-19 Restart Plan ("Restart Plan").[1] Kristen's regular dormitory room was with numerous other roommates, who lived with her and

---

[1] *See Seton Hall University Fall 2020 Restart Plan (May 6, 2024),* https://www.shu.edu/health-intervention-communication/fall-2020-plan.html#:~:text=The%20University%20will%20limit%20the,will%20allow%20for%202022%20beds*;* Seton Hall University Fall 2020 Restart Plan Webpage (May 6, 2024), https://www.shu.edu/health-intervention-communication/fall-2020-plan.html#:~:text=The%20University%20will%20limit%20the,will%20allow%20for%202022%20beds.

could call for help if she had a seizure. However, Kristen was moved by the Defendants to their designated isolation dormitory room, where she was left alone on the day of her death, after one of her roommates who had also tested positive for COVID-19 was discharged from that room.

6.      Pursuant to the Restart Plan, this isolation dormitory room was "designated" by the Defendants, under their exclusive control, and the conditions that Kristen endured in isolation were directly planned and organized by the Defendants. The Restart Plan is vague, with little detail regarding these "designated" rooms, but did offer the failed promise to students of "health monitoring" and "other essential services", which Defendants failed to provide to Kristen while she was in mandatory isolation.

7.      In actuality, Defendants failed to establish a plan to care for students who tested positive for COVID-19 and were required to isolate in a designated dormitory room, with apparently no planned health or safety checks. In addition, and even more concerning, Defendants placed Kristen in mandatory isolation, where she was left alone on the night that she died, with no plan in place for how to help Kristen if she were to have a seizure, which was reasonably foreseeable.

8.      On the morning Kristen was intended to be released from mandatory isolation, she was discovered by University personnel face down in her room, unresponsive, and was unable to be revived. Kristen died alone in her isolation room of a seizure, according to the autopsy report, with nobody present monitoring her health and safety to call for help, which likely would have saved her life.

9.      After Kristen's passing, Defendants treated Kristen's parents callously, making them feel disrespected and insulted by their refusals to provide them with any information or documentation whatsoever regarding the circumstances surrounding Kristen's death. After pursuing the matter further, Defendants eventually provided Kristen's parents with very minimal,

basic information that lacked the details sufficient to determine what truly happened to their daughter.

10.   Even despite multiple letters from their attorneys seeking information, the Defendants have chosen to intentionally conceal that information from the Plaintiffs. Defendants refuse to even produce the results of the investigation into Kristen's death that occurred, making it difficult and/or impossible for Kristen's parents to adequately pursue the legal interests of themselves and their daughter's Estate, and denying them closure regarding Kristen's death.

11.   Accordingly, Plaintiffs bring this action for damages stemming from Defendants' acts and omissions, as described herein.

## THE PARTIES

12.   Kristen McCartney, the decedent at issue in this action, was a natural person, resident and domiciliary of the State of North Carolina prior to her death on September 20, 2021.

13.   Plaintiff Donna Dockery ("Dockery" or "Ms. Dockery" or "Kristen's Mother") is a natural person, the mother of Kristen McCartney, and a duly appointed Administrator of Kristen's Estate pursuant to an Order from the Mecklenburg County Superior Court in North Carolina. Ms. Dockery is a resident and domiciliary of the State of North Carolina.

14.   Plaintiff Sean McCartney ("McCartney" or "Mr. McCartney" or "Kristen's Father)[2] is a natural person, the father of Kristen McCartney, and a duly appointed Administrator of Kristen's Estate pursuant to an Order from the Mecklenburg County Superior Court in North Carolina. Mr. McCartney is a resident and domiciliary of the State of North Carolina.

---

[2] Dockery and McCartney referred to collectively herein as "Kristen's parents".

15.    Defendant Seton Hall University, also known as The Catholic University of New Jersey, is a federally funded[3], private, tax-exempt non-profit, Catholic diocesan university located in South Orange, New Jersey, in operation since 1856. Seton Hall University was incorporated in the State of New Jersey in 1861, and its principal place of business is at 400 South Orange Avenue, South Orange, NJ 07079.

16.    Defendant Seton Hall University Board of Trustees ("Board of Trustees")(all Defendants also referred to collectively as "Seton Hall" or the "University"), is a 16 member board, with a Chair who is also the President of the Roman Catholic Archdiocese of Newark. The Board of Trustees is the primary governing body of Seton Hall, responsible for the overall "character" of the University, and the selection of the members of the Board of Regents. *See* University By-Laws, Seton Hall University, p. 2-4 (May 3, 2024), https://www.shu.edu/documents/University-By-Laws.pdf.

17.    Defendant Seton Hall University Board of Regents ("Board of Regents")(all Defendants also referred to collectively as "Seton Hall" or the "University") is responsible for the entire management of the affairs of Seton Hall and concerns of the University, is vested with the responsibility, power and authority to govern the University, and shall exercise the corporate powers of the University under Law. The Board of Regents is entrusted with selecting the president, overseeing faculty and administrative appointments, supervising the budget and endowment, upholding the University By-Laws, and protecting the University property. *See*

---

[3] Seton Hall database of federal funding (May 3, 2024), https://www.shu.edu/grants-research-services/funding-resources.html; National Center for Education Statistics, Integrated Postsecondary Education Data System ("IPEDS"), Institution Profile for Seton Hall University (May 3, 2024), https://nces.ed.gov/ipeds/datacenter/institutionprofile.aspx?unitId=186584&goToReportId=6&sid=37724f44-74d5-409b-968f-75ac470e19cd&rtid=6.

University   By-Laws,   Seton   Hall   University,   p.   5-6,   (May   3,   2024), https://www.shu.edu/documents/University-By-Laws.pdf.

18.   Defendant Joseph W. Tobin ("Cardinal Tobin") is Cardinal of the Archbishop of Newark, New Jersey, the Chair of Seton Hall's Board of Trustees, the President of the Board of Regents, and was, upon information and belief, in those positions at all relevant times.

19.   Defendant Joseph E. Nyre ("President Nyre) is the former President of Seton Hall and held that position at all relevant times.

20.   Defendant Diane Lynch ("Director Lynch") is the Director of Seton Hall's University Health Services, and was, upon information and belief, in that position at all relevant times.

21.   Defendant John Doe ("Director Doe") is the Director of Housing and Residence Life, and was, upon information and belief, in that position at all relevant times.

## **OPERATIVE FACTS**

**I.      Kristen's Epilepsy Diagnosis and Treatment.**

22.   In 2011, when Kristen was in third grade, her parents noticed she had developed what they thought was a tick, where Kristen would persistently wave her hand in front of her face. Plaintiffs took Kristen to a physician who performed an EEG and diagnosed her with epilepsy, a neurological disorder that causes surges of electrical activity in the brain and can cause recurring seizures.[4]

23.   After Kristen's epilepsy diagnosis, Kristen began a strict treatment regimen and was placed on Keppra, a prescription drug for seizure management.

---

[4] *See* Epilepsy Foundation, What is Epilepsy? (May 6, 2024), https://www.epilepsy.com/what-is-epilepsy.

24.     In 2012, Kristen suffered her first Grand Mal seizure,[5] a severe seizing of the brain causing loss of consciousness and violent muscle contractions. She sought a second opinion from another physician and began a long road of trial and error to treat her epilepsy disorder. She underwent changes to her medications, and treatment by different teams of medical professionals.

25.     In or about 2013-2014, Kristen was formally diagnosed with Jeavon's Syndrome, also called epilepsy with Eyelid Myoclonia, which is a rare form of epilepsy that can cause several different types of seizures,[6] by Dr. Yael Shiloh, at the University of North Carolina at Chapel Hill.

26.     Over the next eight (8) years, Kristen tried different drug treatments, and sought the medical opinions of five doctors, but she continued to have Grand Mal and Absence[7] seizures. On average, Kristen suffered two Grand Mal seizures each year for approximately eight years between her original diagnosis and 2019.

27.     In or about 2019, Kristen was also diagnosed with Sunflower Syndrome, a form of epilepsy characterized by highly stereotyped seizures, where the individual turns toward a bright light while waving one hand in front of their eyes, coupled with abrupt lapses in consciousness.[8]

---

[5]     *See* Mayo Clinic, Tonic-Clonic (Grand Mal) Seizure, (May 6, 2024), https://www.mayoclinic.org/diseases-conditions/grand-mal-seizure/symptoms-causes/syc-20363458.

[6] Epilepsy Foundation, Epilepsy Eyelid Myoclonia Jeavons Syndrome
(May 6, 2024), https://www.epilepsy.com/what-is-epilepsy/syndromes/epilepsy-eyelid-myoclonia-jeavons-syndrome; *See* Zawar I, Knight EP. Epilepsy With Eyelid Myoclonia (Jeavons Syndrome). Pediatr Neurol. 2021 Aug;121:75-80. doi: 10.1016/j.pediatrneurol.2020.11.018. Epub 2020 Dec 1. PMID: 34167046 (May 6, 2024), https://pubmed.ncbi.nlm.nih.gov/34167046/#:~:text=Epilepsy%20with%20eyelid%20myoclonias%2C%20or,or%20seizures)%2C%20and%20photosensitivity.

[7] An absence seizure is a seizure of the brain causing short-term and sudden lapses of consciousness. *See* https://www.mayoclinic.org/diseases-conditions/petit-mal-seizure/symptoms-causes/syc-20359683   (last accessed February 15, 2024).

[8]     Massachusetts General Hospital, What is Sunflower Syndrome?, (May 6, 2024), https://massgeneral.org/children/sunflower-syndrome#:~:text=Sunflower%20syndrome%20is%20a%20rare%2C%20epileptic%20disorder%20characterized%20by%20highly,with%20abrupt%20lapses%20in%20consciousness.

28.    In or around January of 2020, Plaintiffs met with Dr. Elizabeth Thiele ("Dr. Thiele"), at Massachusetts General Hospital, who believed that Kristen suffered from Sunflower Syndrome. Dr. Theile was in the process of working on a clinical trial for a drug treatment called Fenfluramine, but Kristen was unable to start taking the drug because it was still not approved.

29.    Between January 2020 and Kristen's untimely death in September 2021, Plaintiffs continued to see Kristen's usual doctors for everyday treatment of her epilepsy, and kept in contact with Dr. Thiele, hoping that Fenfluramine would receive approval so that Kristen could begin that course of treatment.

30.    Epilepsy is considered to be a disability, covered under the protections afforded by the Americans with Disabilities Act, since epilepsy is a physiological disorder affecting the neurological system, causing an impairment that substantially limits participation in a major life activities.[9] Epilepsy is a disability even if seizures are under control with medication,[10] and in Kristen's case, her seizures were not yet under control.

## II.    Kristen Enrolls as a Student at Seton Hall During the COVID-19 Pandemic and Notifies the University of her Epilepsy Disorder.

31.    In or about the Spring of 2020, Kristen received an acceptance letter from Seton Hall to attend in the Fall semester of 2020, and was offered a scholarship.

32.    In March of 2020, the COVID-19 pandemic hit the United States.

33.    Kristen began her freshman year at the University in late August of 2020.

---

[9]    ADA.gov, Introduction to the Americans with Disabilities Act (May 6, 2024), https://www.ada.gov/topics/intro-to-ada/.

[10]    Epilepsy.com, Wellness and Epilepsy Toolkit - 2019 (May 6, 2024), https://www.epilepsy.com/sites/default/files/atoms/files/Education%20and%20Employment%20Factsheet.pdf.

34.    Prior to attending Seton Hall, Kristen's parents reached out to the University multiple times to inform them of Kristen's epilepsy diagnosis, providing the school with actual notice of Kristen's disability.

35.    Before matriculating at the University, Kristen completed a university health insurance waiver, and submitted documents to Seton Hall detailing her epilepsy condition, further providing the school with actual notice of her disability.

36.    Seton Hall's acceptance of Kristen as a student at the University, despite her Epilepsy disability, explicitly, or at least tacitly, acknowledged Seton Hall's ability to ensure the health and safety of Kristen as a student with a disability at Seton Hall, which Kristen's parents relied upon in sending their daughter to the University.

37.    Seton Hall should have, yet failed, to create a viable plan for how to address Kristen's disability in the event that she would have a seizure while a student at Seton Hall, especially in light of the existence of a pandemic.

**III.    <u>Kristen's First Year at Seton Hall.</u>**

38.    During her first year at Seton Hall, Kristen took full advantage of all that the College had to offer, and excelled academically. Kristen hoped to attend law school after graduation from college.

39.    Kristen lived on campus during her first year in a dormitory with three roommates.

40.    It was important for Kristen to live in a dormitory room with roommates, so that she had others around in the event that she suffered another Grand Mal or other type of seizure, which at that time were still generally occurring twice per year.

41.     In March of 2021, Kristen joined the sorority Alpha Omicron Pi. Kristen's sorority sisters described her as "the most hilarious and free-spirited person" with "contagious energy that made everyone around her smile and laugh".[11]

## IV.    Kristen Was Rejected From Seton Hall's Soccer Team Due To Her Epilepsy Disability.

42.     In her first year Kristen also sought to join Seton Hall's women's soccer team, once its activities resumed after the onset of the pandemic. Kristen spoke with Assistant Coach Allison Saucier ("Saucier") and Head Coach Ciara Crinion ("Crinion") about her hopes of joining the Seton Hall soccer team. Crinion and Saucier expressed interest in Kristen as a potential soccer player, and requested Kristen send them a highlight reel of her soccer games, which she provided. Kristen was then offered an in person meeting to discuss the opportunity. As part of their discussions, Kristen, Crinion, and Saucier had extensive conversations about her epilepsy.

43.     On August 18, 2020, Kristen had an in-person conversation and physical examination with Saucier and Crinion where Kristen's epilepsy was discussed in detail. The physical examination consisted of a concussion impact test, a vision test, and a vitals test.

44.     After Kristen's August 18, 2020 physical, the Seton Hall Athletic Department asked Kristen for her medical records detailing her epilepsy, which she provided. Kristen was later told by Saucier and Crinion that she would be unable to join the soccer team, upon information and belief, due to her epilepsy disability.

## V.     Kristen Had Seizures On Campus in 2020 and 2021 During Her First Year.

45.     On or about December 1, 2020, Kristen suffered her first seizure on campus.

---

[11] Alpha Omicron Pi Article, Alpha Omicron Pi Honors the Life of Kristen McCartney, September 22, 2021, https://www.alphaomicronpi.org/news/alpha-omicron-pi-honors-the-life-of-kristen-mccartney/; Alpha Omicron Pi Press Release, Alpha Omicron Pi Honors the Life of Kristen McCartney, September 22, 2021, https://www.alphaomicronpi.org/wp-content/uploads/2021/09/Press-Release-Alpha-Omicron-Pi-Honors-the-Life-of-Kristen-McCartney.pdf.

46.    On or about January 31, 2021, less than two (2) months later, Kristen had a second seizure on campus. Kristen informed Seton Hall of her seizure by informing one of her professors after the January 31st seizure.

47.    After her seizures, Kristen received no follow up from Seton Hall regarding her condition or well-being, nor did Seton Hall offer any type of plan or assistance to help her manage her disability while on campus.

48.    Defendants had actual and constructive notice of Kristen's seizure disorder, and the fact that she had two (2) seizures on campus in 2020 and 2021.

## VI.    Seton Hall's COVID-19 Restart Plan.

49.    On June 18, 2020, the state of New Jersey issued standards and guidelines for all New Jersey colleges and universities to follow ("Restart Standards").[12] The Restart Standards encompassed 10 key on-campus functional areas, including residential housing and student services, among others.

50.    On July 2, 2020, Seton Hall issued a University wide Restart Plan,[13] which was formally submitted to the state of New Jersey, as required, by then Seton Hall President Joseph E. Nyre ("President Nyre").

51.    Seton Hall's Restart Plan addressed the University's strategy for handling certain areas of instruction and university operations, including, but not limited to, on-campus residential housing, including "designated quarantine and isolation rooms for students who live on-campus

---

[12] Office of the Secretary of Higher Education, Restart Standards for all New Jersey Institutions of Higher Education, Last Updated: August 31, 2020 (May 6, 2024), https://www.nj.gov/highereducation/documents/pdf/index/OSHErestart.pdf.

[13] *See Seton Hall University Fall 2020 Restart Plan (May 6, 2024),* https://www.shu.edu/health-intervention-communication/fall-2020-plan.html#:~:text=The%20University%20will%20limit%20the,will%20allow%20for%202020%20beds; Seton Hall University Fall 2020 Restart Plan Webpage (May 6, 2024), https://www.shu.edu/health-intervention-communication/fall-2020-plan.html#:~:text=The%20University%20will%20limit%20the,will%20allow%20for%202020%20beds.

and … have symptoms or a positive diagnosis of COVID-19".[14] For those who test positive for Covid-19, they were placed in "isolation rooms" in dormitories that were "designated" by Seton Hall's Department of Housing and Residence Life, to include private bathrooms.[15]

52.   The Restart Plan also promised that Seton Hall "will provide" "food service … health monitoring … and other essential services" for students required to move to "isolation" rooms in dormitories from their regularly assigned dormitory room because they test positive for COVID-19."[16]

53.   The Restart Plan provides no other detail regarding these "designated" rooms, the "health monitoring" that is promised, or the "other essential services" that would be provided to students required to live in isolation.

## VII.   Kristen Tests Positive for Covid-19 in her Second Year.

54.   On August 27, 2021, Kristen was dropped off by her parents at the University for her second year, with her first day of classes to start on August 30th.

55.   Kristen had now chosen her major and began pursuing a degree in the International Relations & Diplomacy.

56.   Once again, Kristen lived in on-campus housing with three (3) roommates.

57.   On September 9, 2021, Kristen had a sore throat and tested herself for COVID-19, which was negative.

58.   On the same day, one of Kristen's roommates tested positive for COVID-19, and was moved into a mandatory isolation dormitory room, as required by the University.

---

[14] *Id*. at p. 5.
[15] *Id*. at p. 11.
[16] *Id*. at p. 8.

59.    On September 10, 2021, Kristen texted her parents and asked what she should do about her persistent sore throat, and they told her to get tested for strep throat. Following her parents' advice, Kristen tried to schedule a health department appointment on campus but was unable to schedule an appointment that fit within her class schedule. Therefore, Kristen went to the local CVS and received both a COVID-19 test and a strep throat test. Kristen tested negative for strep throat but positive for COVID-19.

60.    On September 10, 2021, Kristen contacted University Health Services to report that she had tested positive for COVID-19. She was provided with instructions for mandatory isolation in Neumann Hall, Room 2210C, away from her regular dormitory, and was required to stay there from September 10 through September 20th. One of Kristen's roommates stayed in the room with her initially, since she had tested positive for COVID-19 the day prior.

61.    Upon information and belief, Seton Hall failed to create a plan to adequately care for students while in mandatory isolation. In addition, Seton Hall failed to create any plan to address Kristen's specific medical needs due to her epilepsy disability, which put her at an increased risk for an adverse health event due to testing positive for Covid-19.[17]

62.    Kristen and her roommate remained in the isolation room together until the roommate was allowed to leave on September 19, 2021 and return to her regular dormitory. On that date, Kristen, who had never lived alone while attending Seton Hall, was left alone in the isolation dormitory room.

---

[17] Vossler DG. Does SARS-CoV-2 Cause Seizures and Epilepsy in COVID-19 via Inflammation or by Direct Infection? Epilepsy Curr. 2023 Mar 27;23(3):153-155. doi: 10.1177/15357597231160601. PMID: 37334425; PMCID: PMC10273813 (The incidence of new seizures or epilepsy diagnoses in the 6 months after COVID-19 was higher than in matched patients with influenza, in those with less severe infection. Children appear at particular risk of seizures and epilepsy after COVID-19.).

63.     On the evening of September 19, 2021, Kristen ordered, and was delivered, food to her room.

64.     Upon information and belief, when Seton Hall left Kristen alone in her isolation room on September 19, 2021, the University acted knowingly and/or with reckless disregard for the inherent risk to Kristen presented by living in mandatory isolation with COVID-19 and epilepsy. The University, with actual and/or constructive knowledge of Kristen's epilepsy disability, ignored Kristen's risk and propensity to suffer catastrophic seizures, and left her alone in isolation without any medical or safety protocols in the event she suffered a seizure.

65.     Upon information and belief, it appears that Seton Hall failed to even provide the most basic "health monitoring" and "other essential services" that it promised to all students who tested positive for Covid-19 and were placed in mandatory on-campus isolation.[18]

## VIII.   Kristen Suffers a Seizure and Passes Away Alone in Seton Hall's Mandatory Isolation Dormitory Room.

76.     On September 20, 2021, Kristen was informed that she was eligible to leave the quarantine dorm at 8:00am, based on Seton Hall's protocols.

77.     On the night of September 19th, Kristen had a video call with her roommates and made a plan to have breakfast together the next morning, September 20th.

78.     On the morning of September 20th, at 8:00am when Kristen was supposed to check out of her isolation dormitory room, she failed to check out. Kristen also did not show up to meet her roommates for breakfast.

79.     At 11:52am Seton Hall's Department of Housing and Residence Life personnel Dennis Shuck ("Shuck") called the school's Department of Public Safety. A Department of Public Safety

---

[18] Seton Hall University Fall 2020 Restart Plan Webpage (May 6, 2024), p. 8, https://www.shu.edu/health-intervention-communication/fall-2020-plan.html#:~:text=The%20University%20will%20limit%20the,will%20allow%20for%202202%20beds.

Incident Report ("DPS Report") states that Mr. Shuck was checking to see if Kristen's room had been vacated, upon information and belief at approximately 11:35am, when he discovered her lying face down on the floor unresponsive. Public Safety Officers Goncalves, Sullivan, Anokye, and Iossa responded to the scene.

80.    At 11:56am the South Orange Police were called, and Officers O'Connor and Cooper arrived on the scene, along with Robert Wood Medical Center personnel and paramedics. A South Orange Police Incident Report ("Police Report") states that Kristen was found face down on her bed, rather than on the floor as the Seton Hall Officers reported.

81.    The Public Safety and South Orange Police Officers present initiated CPR on Kristen, until 12:19pm, when it was determined that she had passed away.

82.    Sometime thereafter, South Orange Police Detective Leacock arrived on the scene to process it.

83.    The Essex County Medical Examiner's Office was contacted for the pronouncement, and President Khoury of Newark Beth Israel Hospital declared Kristen dead via radio telemetry.

84.    The Medical Examiner's Office Investigator Maureen Gardner arrived on the scene and took custody of the decedent.

85.    Director of Seton Hall Public Safety Pat Linfante was then called, and he arrived on the scene with other Public Safety personnel. Director Linfante said he would notify the next of kin.

86.    The Police Report states that Kristen had a seizure disorder, evidencing that Seton Hall knew of Kristen's Epilepsy and had informed the Police of that condition on the date of her death.

87.    Upon information and belief, Kristen suffered a Grand Mal seizure, which may have caused her to bite her tongue and suffocate in her blankets, during the night of September 19th

between the time of her video call with her roommates that night, and her scheduled checkout time of 8:00am. Since Seton Hall left Kristen alone in her isolation room, there was nobody present to assist her or call for help when she had the seizure.

88.   Upon information and belief, Seton Hall did not even perform routine daily checks on students in mandatory isolation, which would have been especially critical for Kristen, who had a seizure disorder and an increased risk of complications from COVID-19.

89.   Upon information and belief, at no point during Kristen's stay in mandatory isolation did any medical personnel or the University staff check on her, despite Seton Hall's actual and constructive knowledge of the possibility of her suffering life threatening seizures, and that she had COVID-19.

90.   If Seton Hall had provided Kristen with adequate health monitoring for her COVID-19 diagnosis and seizure disability during the night of September 19th, it is likely that her life could have been saved.

IX.   **Seton Hall Refused to Provide Kristen's Parents With Reasonable and Basic Information Regarding the Circumstances of Her Death.**

91.   Plaintiffs were not notified by then President Nyre of Kristen's passing, until approximately 1:30pm on September 20, 2021, two (2) hours after she was discovered by Mr. Shuck. By that time, Kristen had already been declared deceased and her body was removed by the Medical Examiner's office.

92.   To date, the University has not provided Plaintiffs with any explanation as to why they were not immediately notified of their daughter's medical emergency at the time of her discovery.

93.   On September 21, 2021, at or about 12:30pm, Kristen's parents went to Seton Hall from their home in North Carolina, with Kristen's sister and brother-in-law, and met with the Vice President of Student Services Monica Burnette ("Burnette"), Dean of Students Karen Van Norman

("Van Norman"), and Public Safety Officer Mike Bradley ("Bradley"). During the meeting Kristen's parents asked Burnette, Van Norman, and Bradley reasonable and basic questions about what happened to their daughter, and were met with only a denial of any knowledge whatsoever. Kristen's parents were shocked by this refusal to provide them with any information regarding the circumstances of Kristen's death, especially in light of the fact that over twenty-four hours had already passed since her death. Kristen's parents felt like the Seton Hall personnel were unprepared for the meeting, and thus felt disrespected and insulted by them.

94.   During the September 21, 2021 meeting, Kristen's parents asked Burnette, Van Norman and Bradley for a copy of the University's COVID-19 protocols, however they refused to provide it to them.

95.   On or about September 22, 2021, Kristen's parents were forced to identify the body of their daughter over Zoom, due to COVID-19 restrictions in place at that time.

96.   On September 22, 2021, Kristen's parents went to Seton Hall again to meet with President Nyre, Father Colin Kay, and Ms. Burnette. They expressed to President Nyre their dissatisfaction with the refusal by Burnette, Van Norman, and Bradley to provide them with any information regarding the circumstances of Kristen's death at the meeting the day prior. They also requested, again, a copy of the COVID-19 protocols. President Nyre promised Kristen's parents that they would be provided with whatever information and documentation they needed before returning home to North Carolina. They were told by President Nyre that more information would be made available in several weeks, after they received information from the Police and Medical Examiner's Office. They were also told that more information was being compiled regarding Kristen's final 36 hours, and that it would be provided to them in writing. President Nyre went so

far as to state that Seton Hall had no intention of keeping information from them, and gave his assurance that the information would be provided to them in real time.

97.    President Nyre's promise to provide Kristen's parents with the circumstances surrounding Kristen's death has proven to be meaningless, and he may have intentionally misled them. To date, Seton Hall has refused to provide them with that information. They haven't even been provided with a copy of the University's COVID-19 protocols, or any other documents they have requested.

98.    On the evening of September 22, 2021, a candlelight vigil was held on Seton Hall's campus to celebrate Kristen's life, organized by her friends and sorority sisters.

99.    On September 23, 2021, Kristen's parents returned to North Carolina with no more clarity regarding what happened to their daughter than when they arrived at Seton Hall two (2) full days prior.

100.    Despite their daughter dying on campus, and Seton Hall's cold and secretive handling of Kristen's death, Seton Hall sent her parents multiple donation requests at both of their respective homes for months after her death. Her mother made multiple requests to Ms. Burnette for the donation requests to stop, yet they callously continued.

101.    Kristen's parents also attempted for months to obtain the autopsy report from the New Jersey State Department of Health ("Autopsy Report"), but did not receive it until May 23, 2022, more than eight (8) months after Kristen's death. Therefore, the Plaintiffs did not know, or have reason to know, of the cause of death of their daughter until that date. The Autopsy Report is dated September 21, 2021, the date that the examination was performed by Assistant Medical Examiner Gregory Conti. The stated cause of death was due to Epilepsy.

### X.     Plaintiffs Provided Seton Hall With Notice of Legal Claims Through Multiple Letters From Their Attorneys.

102.   On November 12, 2021, Plaintiffs' attorney Andrew Miltenberg sent a letter to the President of Seton Hall at the time, President Nyre, submitting formal complaints to the University regarding the failure to provide adequate information about the circumstances surrounding Kristen's death. The letter included numerous questions that remained unanswered, and noted the broken promises that were made by Seton Hall to provide Kristen's parents with information. The letter also asked for evidence to be preserved by Seton Hall in light of potential future litigation, providing Seton Hall with actual notice of Plaintiff's potential legal claims.

103.   The questions contained in that November 12, 2021 letter included:

- What precipitated Mr. Schuck's visit to Kristen's quarantine dorm room on Monday 9/20/21? Was he asked to check on her, and if so, by whom? Was Kristen's door locked?
- Who was the last SHU staff member to have any type of contact with Kristen?
- Which SHU staff members communicated with Kristen while she was in quarantine? When did these communications occur? What was the substance of these communications?
- Who was the last SHU staff member to physically see Kristen before she died?
- How often did SHU staff check on students in quarantine? What was the policy in place at the time of Kristen's death regarding security checks on students in quarantine?
- Relatedly, did the twenty-four-hour security guard in Neumann Hall perform any type of check on Kristen, or any students, while in quarantine?
- Did anyone check on Kristen after her quarantine roommate moved out on the morning of Sunday, September 19, 2021?
- When SHU staff delivered Kristen's dinner Sunday evening, was the meal tray placed outside her door or inside her room?
- When Kristen was found unresponsive Monday morning, was the meal tray inside her room or out in the hallway?
- Please provide a copy of SHU's incident report.
- Please provide a copy of the discharge instructions that SHU emailed to Kristen before she was supposed to move out of Neumann Hall.
- Does SHU staff clean the quarantine rooms after students are discharged? Has Kristen's room in Neumann Hall been cleaned? Aside from the personal belongings returned to Kristen's family, was any evidence collected from the scene? If so, please provide a detailed list with descriptions of all items found.
- Who were the SHU Public Safety Officers who initially responded to the scene? What time did they arrive?
- Who was the EMT who initially responded to the scene and performed CPR? What time did the EMT arrive?

19

- Has SHU interviewed anyone about Kristen's death? Does it plan to conduct any type of investigation?
- Has SHU complied with the SOPD subpoena?
- How many other students were staying in Neumann Hall at the time Kristen died?
- Who was Kristen's roommate in Neumann Hall? How many days did she stay in Neumann Hall at the same time as Kristen? Has she been interviewed by anyone?
- Who were Kristen's suitemates in Neumann Hall? Was her one known suitemate in the adjacent room when Kristen was found unresponsive? Did the suitemate continue staying in the adjacent room after that incident? How many days did she stay in Neumann Hall at the same time as Kristen? Has she been interviewed by anyone?
- Who were the other students staying on the same floor as Kristen in Neumann Hall?
- How does SHU know that Kristen was communicating with her friends on Sunday, September 19, 2021, and made breakfast plans for Monday, September 20, 2021? Did it gather that information from emails, from interviewing Kristen's friends, or from some other source? Please provide sources of all information, documents utilized, and other data reviewed.
- Please provide all other information, documents, and communications regarding any of the foregoing.

105.   On November 30, 2021, Seton Hall's attorney Patrick Papalia sent a response letter stating: "Because this matter is the *subject of a pending investigation*, Seton Hall University is *unable to comply with your requests for further information*. Seton Hall University has already provided meaningful information to Ms. McCartney's family at their request. If and when anything changes, we will reach out to you." (Emphasis added).

106.   Despite Seton Hall's assurance in its November 30, 2021 letter that an investigation of the circumstances surrounding Kristen's death was taking place, and the suggestion that further information would be provided once that investigation ended, more than two (2) years have passed and Seton Hall still has not provided Kristen's parents with the results of the investigation, or any further information that would shed light on the terrible circumstances on the night of Kristen's death, and the actions of Seton Hall and its employees and/or other unknown individuals, before and after that event.

107.   Plaintiffs have actively taken a series of steps to seek information from Seton Hall, all of which have been rejected. Seton Hall promised that an investigation was taking place, and

suggested that the Plaintiff would be informed of any further developments (such as the resolution and findings of that investigation). The investigation report is in the hands of Seton Hall, and is being intentionally withheld from the Plaintiffs.

108.   Without the provision of adequate information from Seton Hall regarding Kristen's death, it is difficult and/or impossible for the Plaintiffs to pinpoint precisely who was at fault for Kristen's death.

**COUNT I**
**Wrongful Death:**
**Death Caused by the Wrongful Act of Another**
**Where Pecuniary Losses are Sustained, in Violation of N.J.S.A. 2A:31-1**
**(Against Defendants Seton Hall, Board of Trustees and Board of Regents)**

109.   Plaintiffs repeat and reallege every allegation contained in the above paragraphs as if fully set forth herein.

110.   Defendants owed Kristen a duty of reasonable care to keep her safe on campus, especially during her isolation for testing positive for COVID-19 that was mandated and organized by Defendants.

111.   Defendants' Restart Plan mandated "designated quarantine and isolation rooms for students who live on-campus and … have symptoms or a positive diagnosis of COVID-19".[19] Therefore, when Kristen tested positive for COVID-19, she was instructed to move from her regular dormitory to an isolation room in another dormitory.

112. These "isolation rooms" established by the Defendants' Restart Plan, were "designated" and organized by Defendants' Department of Housing and Residence Life.[20]

---

[19] *Id*. at p. 5.
[20] *Id*. at p. 11.

113. Defendants' Restart Plan promised to provide Kristen with "food service … health monitoring … and other essential services" while in mandatory "isolation".[21]

114. The Restart Plan provides no other detail regarding these "designated" rooms, the "health monitoring" that is promised, or the "other essential services" that would be provided to students required to live in isolation.

115. Rather than provide Kristen with the "health monitoring" and "essential services" required for her COVID-19 diagnosis and her seizure disorder, Defendants instead left her unsupervised, alone in an isolation room, where she had a seizure and died.

116. Defendants failed to use reasonable care when they left Kristen alone in isolation without monitoring her health, not only because she had contracted COVID-19, but also because she had a serious seizure disorder.

117. Defendants knew about Kristen's Epilepsy, and that she had seizures generally about twice per year.

118. Defendants knew that Kristen's disability constituted a comorbidity that made her especially susceptible to complications from the COVID-19 virus.

119. At all relevant times, Defendants had custody and control over the building where Kristen died.

120. Defendants were responsible to uphold the By-Laws of the University, and protect students on its property.

121. As a direct and proximate result of Defendants' intentional, negligent, and/or reckless acts, the Defendants caused Kristen's death, and as a result, have deprived Plaintiffs of Kristen's support, care, comfort, companionship, and attention.

---

[21] *Id.* at p. 8.

122.   Defendants have further caused Kristen's life to abruptly end at the young age of twenty (20), depriving her and her Estate of achieving her college degree, and securing future employment, resulting in a loss of her earning capacity through the average age of 68.3 years,[22] factoring in her decreased life expectancy of 10.91 years due to her epilepsy.[23]

123.   Defendants have further caused Plaintiffs to incur hospital and medical expenses on behalf of Kristen.

124.   Defendants have further caused Plaintiffs to incur funeral and other expenses in connection with Kristen's funeral.

125.   Defendants have further caused Plaintiffs to incur expenses in the settlement of Kristen's Estate.

126.   **WHEREFORE,** Plaintiffs demand judgment in their favor and against Defendants on this count, together with compensatory and equitable relief, all remedies available under the law, pecuniary damages, attorneys' fees and costs of suit, and for and such other equitable and just relief.

### COUNT II
### Breach of Contract
### (Against Defendants Seton Hall, Board of Trustees and Board of Regents)

127.   Plaintiffs repeat and reallege every allegation contained in the above paragraphs as if fully set forth herein.

128.   Courts in New Jersey recognize an implied agreement between students and universities. *Mucci v. Rutgers*, No. CIV. 08-4806 RBK, 2011 WL 831967 (D.N.J. Mar. 3, 2011) at

---

[22] Time, Why U.S. Women Now Live Almost 6 Years Longer Than Men (November 14, 2023), https://time.com/6334873/u-s-life-expectancy-gender-gap/.
[23] Dreier JW, Laursen TM, Tomson T, Plana-Ripoll O, Christensen J. Cause-specific mortality and life years lost in people with epilepsy: a Danish cohort study. Brain. 2023 Jan 5;146(1):124-134. doi: 10.1093/brain/awac042. PMID: 35234848.

*20 quoting *Mittra v. Univ. of Med. And Dentistry of N.J.* 316 N.J. Super. 83 (N.J. Super. Ct. App. Div. 1998).

129.   Where a case involves the application of university policies, courts have typically considered whether "(1) the university substantially departed from its own rules and regulations, (2) the procedures employed by the university were fundamentally fair, and (3) the university's decisions were supported by sufficient evidence." *Powell v. Seton Hall Univ.*, Civil Action 2:21-cv-13709-WJM-JSA, 10 (D.N.J. Apr. 26, 2022), citing *Keles v. Bender*, No. Civil No. 17-1299 (ES) (JAD), 2021 WL 568105, at *4 (D.N.J. Feb. 16, 2021); *see also Dougherty v. Drew Univ.*, 534 F.Supp.3d 363, 374 (D.N.J. 2021)(noting contexts in which courts have applied "substantial departure" standard of review of university action).

130.   At all times relevant hereto, a contractual relationship existed between Kristen and Defendants because Kristen was a paying, matriculated student, living in on-campus housing, with a known disability, and thus Defendants were responsible for Kristen's health and safety.

131.   Defendants were responsible to uphold the By-Laws of the University, and protect students on its property.

132.   Defendants had an express agreement with Kristen through its Restart Plan to provide adequate "health monitoring" and "essential services".

133.   Rather than provide Kristen with the "health monitoring" and "essential services" promised in the Restart Plan, and required for her COVID-19 diagnosis and her seizure disorder, Defendants instead left her unsupervised, alone in an isolation room, where she had a seizure and died.

134.   Defendants had actual and constructive knowledge of Kristen's Epilepsy, that she had seizures generally about twice per year, and knew that Kristen's disability constituted a comorbidity that made her especially susceptible to complications from the COVID-19 virus.

135.   At all relevant times, Defendants had custody and control over the building where Kristen died.

136.   Kristen's death was a direct, proximate and foreseeable consequence of Defendants numerous material breaches of its implied contract with Kristen. But-for Defendants acts and failures to act, Kristen likely would not have passed away.

137.   As a direct and proximate result of Defendants' intentional, negligent, and/or reckless acts, the Defendants caused Kristen's death, and as a result, have deprived Plaintiffs of Kristen's support, care, comfort, companionship, and attention.

138.   Defendants have caused Kristen's life to abruptly end at the young age of twenty (20), depriving her and her Estate of achieving her college degree, and securing future employment, resulting in a loss of her earning capacity through the average age of 68.3 years,[24] factoring in her decreased life expectancy of 10.91 years due to her epilepsy.[25]

139.   Defendants have further caused Plaintiffs to incur hospital and medical expenses, funeral and other expenses in connection with Kristen's funeral, and expenses in the settlement of Kristen's Estate.

140.   **WHEREFORE,** Plaintiffs demand judgment in their favor and against Defendants on this count, together with compensatory and equitable relief, all remedies available under the law,

---

[24] Time, Why U.S. Women Now Live Almost 6 Years Longer Than Men (November 14, 2023), https://time.com/6334873/u-s-life-expectancy-gender-gap/.
[25]  Dreier JW, Laursen TM, Tomson T, Plana-Ripoll O, Christensen J. Cause-specific mortality and life years lost in people with epilepsy: a Danish cohort study. Brain. 2023 Jan 5;146(1):124-134. doi: 10.1093/brain/awac042. PMID: 35234848.

pecuniary damages, attorneys' fees and costs of suit, and for and such other equitable and just relief.

**COUNT III**
**Breach of Contract:**
**Breach an Implied Covenant of Good Faith and Fair Dealing**
**(Against Defendants Seton Hall, Board of Trustees and Board of Regents)**

141.   Plaintiffs repeat and reallege every allegation contained in the above paragraphs as if fully set forth herein.

142.   At all times relevant hereto, a contractual relationship existed between Kristen and Defendants because Kristen was a paying, matriculated student, living in on-campus housing, with a known disability, and thus Defendants were responsible for Kristen's health and safety.

143.   Defendants were responsible to uphold the By-Laws of the University, and protect students on its property.

144.   Courts in New Jersey recognize an implied agreement between students and universities. *Mucci v. Rutgers*, No. CIV. 08-4806 RBK, 2011 WL 831967 (D.N.J. Mar. 3, 2011) at *20 quoting *Mittra v. Univ. of Med. And Dentistry of N.J.* 316 N.J. Super. 83 (N.J. Super. Ct. App. Div. 1998).

145.   Where a case involves the application of university policies, courts have typically considered whether "(1) the university substantially departed from its own rules and regulations, (2) the procedures employed by the university were fundamentally fair, and (3) the university's decisions were supported by sufficient evidence." *Powell v. Seton Hall Univ.*, Civil Action 2:21-cv-13709-WJM-JSA, 10 (D.N.J. Apr. 26, 2022), citing *Keles v. Bender*, No. Civil No. 17-1299 (ES) (JAD), 2021 WL 568105, at *4 (D.N.J. Feb. 16, 2021); *see also Dougherty v. Drew Univ.*, 534 F.Supp.3d 363, 374 (D.N.J. 2021)(noting contexts in which courts have applied "substantial departure" standard of review of university action).

146.   Defendants clearly departed substantially from their promises to students and the state of New Jersey in the Restart Plan. Rather than provide Kristen with the "health monitoring" and "essential services" promised in the Restart Plan, and required for her COVID-19 diagnosis and her seizure disorder, Defendants instead left her unsupervised, alone in an isolation room, where she had a seizure and died.

147.   Defendants had actual and constructive knowledge of Kristen's epilepsy, that she had seizures generally about twice per year, and knew that Kristen's disability constituted a comorbidity that made her especially susceptible to complications from the COVID-19 virus.

148.   At all relevant times, Defendants had custody and control over the building where Kristen died.

149.   Kristen's death was a direct, proximate and foreseeable consequence of Defendants' numerous material breaches of its implied contract with Kristen . But-for Defendants' acts and failures to act, Kristen likely would not have passed away.

150.   As a direct and proximate result of Defendants' intentional, negligent, and/or reckless acts, the Defendants caused Kristen's death, and as a result, have deprived Plaintiffs of Kristen's support, care, comfort, companionship, and attention.

151.   Defendants have caused Kristen's life to abruptly end at the young age of twenty (20), depriving her and her Estate of achieving her college degree, and securing future employment, resulting in a loss of her earning capacity through the average age of 68.3 years,[26] factoring in her decreased life expectancy of 10.91 years due to her epilepsy.[27]

---

[26] Time, Why U.S. Women Now Live Almost 6 Years Longer Than Men (November 14, 2023), https://time.com/6334873/u-s-life-expectancy-gender-gap/.
[27] Dreier JW, Laursen TM, Tomson T, Plana-Ripoll O, Christensen J. Cause-specific mortality and life years lost in people with epilepsy: a Danish cohort study. Brain. 2023 Jan 5;146(1):124-134. doi: 10.1093/brain/awac042. PMID: 35234848.

152.   Defendants have further caused Plaintiffs to incur hospital and medical expenses, funeral and other expenses in connection with Kristen's funeral, and expenses in the settlement of Kristen's Estate.

153.   **WHEREFORE,** Plaintiffs demand judgment in their favor and against Defendants on this count, together with compensatory and equitable relief, all remedies available under the law, pecuniary damages, attorneys' fees and costs of suit, and for and such other equitable and just relief.

### COUNT IV
### Gross Negligence in Violation of New Jersey Code § 2A:62A-9
### (Against Defendants Cardinal Tobin, President Nyre, Director Lynch and Director Doe)

154.   Plaintiffs repeat and reallege every allegation contained in the above paragraphs as if fully set forth herein.

155.   Gross negligence is an act or omission, beyond ordinary negligence, but less than willful or intentional misconduct. Conduct constitutes gross negligence where an act or failure to act creates an unreasonable risk of harm to another because of the person's failure to exercise slight care or diligence. *Steinberg v. Sahara Sam's Oasis, LLC,* 226 N.J. 344 (2016).

156.   Reckless, willful, or wanton misconduct constitutes gross negligence for the purposes of New Jersey Code § 2A:62A-9. New Jersey Jury Instructions for Gross Negligence, Charge 5.12.

157.   Charitable immunity does not shield acts of gross negligence. New Jersey Code 2A:53A-7, also known as the Charitable Immunity Act, provides immunity to nonprofit organizations, including educational institutions, from liability for grossly negligent acts or omissions. However, that immunity does not apply, as here, to "any trustee, director, officer, employee, agent … causing damage by a willful, wanton or grossly negligent act of commission or omission". New Jersey Code 2A:53A-7(c).

158.  "The tort of gross negligence falls on a continuum between ordinary negligence and recklessness, a continuum that extends onward to intentional conduct." *Steinberg v. Sahara 'am's Oasis, LLC*, 226 N.J. 344, 363 (N.J. 2016).

159.  "Essentially, the concept of willful and wanton misconduct implies that a person has acted with reckless disregard for the safety of others. Where an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences, the law holds him responsible for the injuries he causes." *G.S. v. Dept. Human Serv. DYFS*, 157 N.J.161, 179 (1999).

160.  In New Jersey, Plaintiffs may recover punitive damages where gross negligence includes an act of malice and a wanton and willful disregard for others. N.J.S.A. 2A:15-5.10. Malice is implied by the law from an intentional act, even where the defendant harbored no ill will toward the plaintiff. *Coleman v. Newark Morning Ledger Co.*, 29 N.J. 357, 374, 149 A.2d 193, 202 (1959).[28] The punitive damages statute defines "wanton and willful disregard" as a "deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission". N.J.S.A. 2A:15-5.10. *See Edwards v. Our Lady of Lourdes Hospital*, 217 N.J. Super. 448, 462 (App. Div. 1987); N.J.S.A. 2A:15-5.12.

161.  Defendants in this action created the Restart Plan, without establishing a viable plan for how students in isolation who tested positive for COVID-19 would be cared for, including students with special needs such as Kristen who had a seizure disorder.

162.  Defendants made isolation for students testing positive for COVID-19 mandatory, giving Kristen no choice but to be placed in a different dormitory room, without the aid and

---

[28] Citing *King v. Patterson*, 49 N.J.L. 417, 421, 9 A. 705 (E. & A. 1887); *Hoffman v. Trenton Times*, 17 N.J.Misc. 339, 8 A.2d 837 (Sup.Ct.1939), affirmed 125 N.J.L. 450, 16 A.2d 814 (E. & A.1940); *Bromage v. Prosser*, 4 B. & C. 247, 1 C. & P. 475, 673 (1825); *Hulton & Co. v. Jones*, (1909) 2 K.B. 44, 78 L.J.K.B. 937, affirmed, (1910) A.C. 20,79 L.J.K.B. 198.

comfort of her three (3) roommates, and left there alone on the day that she passed away. When Kristen's roommate in isolation was discharged, the Defendants knew that Kristen would be left in isolation alone, unsupervised, without due and reasonable care for her COVID-19 and Epilepsy.

163.   Defendants took an overt act of establishing the Restart Plan requirements, and instructing Kristen to be placed in isolation, with actual and constructive knowledge of Kristen's positive test for COVID-19, and of her Epilepsy. Defendants ignored Kristen's risk and propensity to suffer catastrophic seizures, and left her alone in isolation without any medical or safety protocols in the event she suffered a seizure.

164.   Defendants failed to create an adequate plan to care for Kristen in isolation, creating an unreasonable risk of harm to her because of the failure of Defendants to exercise care or diligence in establishing a reasonable plan.

165.   Defendants failed to provide Kristen with the most basic "health monitoring" and "other essential services" that it promised to all students who tested positive for Covid-19 and were placed in mandatory on-campus isolation.

166.   Defendants acted with reckless disregard for Kristen's health and safety. An ordinary reasonable person would understand that placing Kristen in isolation with COVID-19 and epilepsy, alone, posed a dangerous risk to her life. Defendants acted without regard for the potentially serious consequences that ensued, and the law holds them responsible for Kristen's death.

167.   The Defendants' act of creating the Restart Plan and mandating that students like Kristen be isolated in a dormitory room of the Defendants' choosing, constituted an intentional act. It is of no consequence in this action whether Defendants harbored any ill will specifically towards Kristen. Defendants' failure, or omission, to establish adequate protocols in place to ensure their health and safety of students in isolation, was also an intentional act.

168.    Defendants acted, and failed to act, deliberately, with knowledge of a high degree of probability of harm to Kristen, and with reckless indifference to the consequences of their acts and omissions, causing her death.

169.    As a direct and proximate result of Defendants' intentional acts and omissions causing Kristen's death, Defendants have deprived Plaintiffs of Kristen's support, care, comfort, companionship, and attention. Defendants have deprived Kristen and her Estate of achieving her college degree, and securing future employment, resulting in a loss of her earning capacity through the average age of 68.3 years,[29] factoring in her decreased life expectancy of 10.91 years due to her epilepsy.[30]

170.    Defendants have further caused Plaintiffs to incur hospital and medical expenses, funeral and other expenses in connection with Kristen's funeral, and expenses in the settlement of Kristen's Estate.

171.    **WHEREFORE,** Plaintiffs demand judgment in their favor and against Defendants on this count, together with compensatory and equitable relief, all remedies available under the law, pecuniary damages, attorneys' fees and costs of suit, and for and such other equitable and just relief.

**COUNT V**
**Fraudulent Concealment**
**(Against All Defendants)**

172.    Plaintiffs repeat and reallege every allegation contained in the above paragraphs as if fully set forth herein.

---

[29] Time, Why U.S. Women Now Live Almost 6 Years Longer Than Men (November 14, 2023), https://time.com/6334873/u-s-life-expectancy-gender-gap/.
[30] Dreier JW, Laursen TM, Tomson T, Plana-Ripoll O, Christensen J. Cause-specific mortality and life years lost in people with epilepsy: a Danish cohort study. Brain. 2023 Jan 5;146(1):124-134. doi: 10.1093/brain/awac042. PMID: 35234848.

173.   In order to state a claim for the tort of fraudulent concealment under New Jersey law, a plaintiff must sufficiently allege: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) a reasonable reliance thereon by the other person; and (5) resulting damages." *Argabright v. Rheem Mfg. Co.*, 250 F.Supp.3d 470, 488-89 (D.N.J. 2017)(quotations omitted). In the context of a fraudulent concealment claim, "[t]he deliberate suppression of a material fact that should be disclosed is viewed as equivalent to a material misrepresentation." *Arcand v. Brother Int'l Corp.*, 673 F.Supp.2d 282, 305 (D.N.J. 2009).

174.   Kristen's parents met with Seton Hall administrators and staff Burnette, Van Norman, and Bradley on September 21, 2021, who were not willing to provide them with any information at all regarding the circumstances of Kristen's death, and they chose instead to make these parents who just lost their child to feel disrespected and insulted. In that meeting, Burnette, Van Norman, and Bradley refused to provide Kristen's parents with a copy of the Seton Hall protocols for the health and safety of students like Kristen who were placed in mandatory isolation dorms of the University's choosing.

175.   On September 22, 2021, desperate for answers, Kristen's parents met with Seton Hall President Nyre, Father Colin Kay, and Ms. Burnette, who provided only minimal information regarding Kristen's death, and refused to answer any of their direct questions. President Nyre went so far as to state that Seton Hall had no intention of keeping information from them, and gave his assurance that the information would be provided to them in writing in real time.

176.   President Nyre's promise to provide Kristen's parents with the circumstances surrounding Kristen's death has proven to be meaningless, and he may have intentionally misled them. To date, Seton Hall refuses to provide them with that information. They haven't even been

provided with a copy of the University's COVID-19 protocols, or any other documents they have requested.

177.  On September 23, 2021, Kristen's parents returned to North Carolina with no more clarity regarding what happened to their daughter than when they arrived at Seton Hall two (2) full days prior.

178.  On November 12, 2021, Plaintiffs' attorney Andrew Miltenberg sent a letter to the President of Seton Hall at the time, President Nyre, submitting formal complaints to the University regarding the failure to provide adequate information about the circumstances surrounding Kristen's death. The letter included numerous questions that remained unanswered, and noted the broken promises that were made by Seton Hall to provide Kristen's parents with information.

179.  The questions contained in that November 12, 2021 letter, to which Defendants continue to refuse to respond, included:

- What precipitated Mr. Schuck's visit to Kristen's quarantine dorm room on Monday 9/20/21? Was he asked to check on her, and if so, by whom? Was Kristen's door locked?
- Who was the last SHU staff member to have any type of contact with Kristen?
- Which SHU staff members communicated with Kristen while she was in quarantine? When did these communications occur? What was the substance of these communications?
- Who was the last SHU staff member to physically see Kristen before she died?
- How often did SHU staff check on students in quarantine? What was the policy in place at the time of Kristen's death regarding security checks on students in quarantine?
- Relatedly, did the twenty-four-hour security guard in Neumann Hall perform any type of check on Kristen, or any students, while in quarantine?
- Did anyone check on Kristen after her quarantine roommate moved out on the morning of Sunday, September 19, 2021?
- When SHU staff delivered Kristen's dinner Sunday evening, was the meal tray placed outside her door or inside her room?
- When Kristen was found unresponsive Monday morning, was the meal tray inside her room or out in the hallway?
- Please provide a copy of SHU's incident report.
- Please provide a copy of the discharge instructions that SHU emailed to Kristen before she was supposed to move out of Neumann Hall.
- Does SHU staff clean the quarantine rooms after students are discharged? Has Kristen's room in Neumann Hall been cleaned? Aside from the personal belongings returned to

Kristen's family, was any evidence collected from the scene? If so, please provide a detailed list with descriptions of all items found.
- Who were the SHU Public Safety Officers who initially responded to the scene? What time did they arrive?
- Who was the EMT who initially responded to the scene and performed CPR? What time did the EMT arrive?
- Has SHU interviewed anyone about Kristen's death? Does it plan to conduct any type of investigation?
- Has SHU complied with the SOPD subpoena?
- How many other students were staying in Neumann Hall at the time Kristen died?
- Who was Kristen's roommate in Neumann Hall? How many days did she stay in Neumann Hall at the same time as Kristen? Has she been interviewed by anyone?
- Who were Kristen's suitemates in Neumann Hall? Was her one known suitemate in the adjacent room when Kristen was found unresponsive? Did the suitemate continue staying in the adjacent room after that incident? How many days did she stay in Neumann Hall at the same time as Kristen? Has she been interviewed by anyone?
- Who were the other students staying on the same floor as Kristen in Neumann Hall?
- How does SHU know that Kristen was communicating with her friends on Sunday, September 19, 2021, and made breakfast plans for Monday, September 20, 2021? Did it gather that information from emails, from interviewing Kristen's friends, or from some other source? Please provide sources of all information, documents utilized, and other data reviewed.
- Please provide all other information, documents, and communications regarding any of the foregoing.

180.    On November 30, 2021 Seton Hall responded to that November 12, 2021 letter from Plaintiffs' attorney refusing to produce *any* information whatsoever. Seton Hall's attorney Patrick Papalia wrote in that letter: "Because this matter is the *subject of a pending investigation*, Seton Hall University is unable to comply with your requests for further information. Seton Hall University has already provided meaningful information to Ms. McCartney's family at their request. If and when anything changes, we will reach out to you." (Emphasis added).

181.    Despite Seton Hall's assurance in its November 30, 2021 letter that an investigation of the circumstances surrounding Kristen's death was taking place, and the suggestion that further information would be provided once that investigation ended, more than two (2) years have passed and Seton Hall still has not provided Kristen's parents with the results of the investigation, or any further information that would shed light on the terrible circumstances on the night of Kristen's

death, and the actions of Seton Hall and its employees and/or other unknown individuals, before and after that event.

182.   Plaintiffs have actively taken a series of steps to seek information from Seton Hall, which were rejected. Plaintiffs informed the school early of the potential of future litigation by asking for evidence to be preserved in the November 12, 2021 letter to the University. In addition, Seton Hall promised that an investigation was taking place, and suggested that the Plaintiff would be informed of any further developments (such as the resolution and findings of that investigation). The investigation report is in the hands of Seton Hall, and is being intentionally withheld from the Plaintiffs.

183.   Without the provision of adequate information from Defendants regarding Kristen's death, it is difficult and/or impossible for the Plaintiffs to pinpoint precisely who was at fault for Kristen's death.

184.   The information and documents pertaining to Kristen's death, and the circumstances surrounding her death, are in the exclusive custody and control of Defendants, who are deliberately suppressing that information from Kristen's parents.

185.   This deliberate suppression of information appears to be an attempt to avoid the liability that the Defendants face due to their acts and omissions that caused Kristen's death.

186.   As a direct and foreseeable consequence of Defendants' suppression of the evidence regarding Kristen's death, Plaintiffs have been harmed because they are not able to adequately pursue their full legal rights, are unable to determine the identity of all parties potentially responsible for Kristen's death, and more simply, are unable to achieve closure for the loss of their twenty (20) year old daughter.

187.   **WHEREFORE,** Plaintiffs demand judgment in their favor and against Defendants on this count, together with compensatory and equitable relief, all remedies available under the law, pecuniary damages, attorneys' fees and costs of suit, and for and such other equitable and just relief.

## JURY DEMAND

Pursuant to R. 1:8-2(b), Plaintiffs hereby demand a trial by jury on all issues raised in the within Pleadings.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Helen J. Setton, Andrew T. Miltenberg, Gabrielle M. Vinci, and Jordan A. Tuchman are designated as trial counsel.

## CERTIFICATION PURSUANT TO R. 4:5-1

I hereby certify that, to the best of my knowledge at this time, the matter in controversy is not the subject of any other action pending in any Court or of a pending arbitration proceeding, nor is any such action or proceeding presently contemplated.

## <u>CERTIFICATION PURSUANT TO R 1:38-7</u>

I hereby certify that confidential personal identifiers will be redacted from all documents

submitted in the future in accordance with R. 1:38-7(a).

**Dated: May 13, 2024**

                                     **Respectfully submitted,**

                                     */s/ Helen Setton*

Helen J. Setton, Esq. (NJ Bar No. 078942014)

Andrew T. Miltenberg, Esq. (*pro hac vice pending*)

Gabrielle M. Vinci, Esq. (*pro hac vice pending*)

Jordan A. Tuchman, Esq. (*pro hac vice pending*)

Kimberly S. Courtney, Esq. (*pro hac vice pending*)

NESENOFF & MILTENBERG, LLP

363 Seventh Avenue, Fifth Floor

New York, New York 10001

Telephone: (212) 736-4500

**ATTORNEYS FOR PLAINTIFF**



New Jersey Judiciary
Civil Practice Division

# Civil Case Information Statement (CIS)

Use for initial Law Division Civil Part pleadings (not motions) under Rule 4:5-1.
Pleading will be rejected for filing, under Rule 1:5-6(c), if information above the
black bar is not completed, or attorney's signature is not affixed.

## For Use by Clerk's Office Only

| Payment type ☐ check ☐ charge ☐ cash | Charge/Check Number | Amount $ | Overpayment $ | Batch Number |
|---|---|---|---|---|

| Attorney/Pro Se Name | Telephone Number | County of Venue |
|---|---|---|
| Helen J. Setton | 212-736-4500   ext. | |

| Firm Name (if applicable) | Docket Number (when available) |
|---|---|
| NESENOFF & MILTENBERG, LLP | |

| Office Address - Street | City | State | Zip |
|---|---|---|---|
| 363 Seventh Ave, 5th Floor | New York | NY | 10001 |

| Document Type | Jury Demand |
|---|---|
| Complaint | ■ Yes   ☐ No |

| Name of Party (e.g., John Doe, Plaintiff) | Caption |
|---|---|
| The Estate of Kristen McCartney et al. | The Estate of Kristen McCartney et al. v. Seton Hall University et al. |

Case Type Number (See page 3 for listing)  699

| | | |
|---|---|---|
| Are sexual abuse claims alleged? | ☐ Yes | ■ No |
| Does this case involve claims related to COVID-19? | ■ Yes | ☐ No |
| Is this a professional malpractice case? | ☐ Yes | ■ No |

If "Yes," see N.J.S.A. 2A:53A-27 and applicable case law regarding your obligation to file an affidavit of merit.

| Related Cases Pending? | ☐ Yes | ■ No |
|---|---|---|
| If "Yes," list docket numbers | | |

| Do you anticipate adding any parties (arising out of same transaction or occurrence)? | ☐ Yes | ■ No |
|---|---|---|

| Name of defendant's primary insurance company (if known) | ☐ None | ■ Unknown |
|---|---|---|

| **The Information Provided on This Form Cannot be Introduced into Evidence.** |
|---|

Case Characteristics for Purposes of Determining if Case is Appropriate for Mediation

Do parties have a current, past or recurrent relationship?      ■ Yes      ☐ No

   If "Yes," is that relationship:

    ☐ Employer/Employee      ☐ Friend/Neighbor      ☐ Familial      ☐ Business

    ■ Other (explain) University Student/University _____

---

Does the statute governing this case provide for payment of fees      ■ Yes      ☐ No
by the losing party?

---

Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition.

---

   ♿   Do you or your client need any disability accommodations?      ☐ Yes      ■ No
       If yes, please identify the requested accommodation:

      Will an interpreter be needed?      ☐ Yes      ■ No
       If yes, for what language?

---

**I certify that confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).**

Attorney/Self-Represented Litigant Signature:      Helen J. Setton, Esq. _____

# Civil Case Information Statement (CIS)

Use for initial pleadings (not motions) under *Rule* 4:5-1

## CASE TYPES

(Choose one and enter number of case type in appropriate space on page 1.)

### Track I - 150 days discovery

| | |
|---|---|
| 151 | Name Change |
| 175 | Forfeiture |
| 302 | Tenancy |
| 399 | Real Property (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction) |
| 502 | Book Account (debt collection matters only) |
| 505 | Other Insurance Claim (including declaratory judgment actions) |
| 506 | PIP Coverage |
| 510 | UM or UIM Claim (coverage issues only) |
| 511 | Action on Negotiable Instrument |
| 512 | Lemon Law |
| 801 | Summary Action |
| 802 | Open Public Records Act (summary action) |
| 999 | Other (briefly describe nature of action) |

### Track II - 300 days discovery

| | |
|---|---|
| 305 | Construction |
| 509 | Employment (other than Conscientious Employees Protection Act (CEPA) or Law Against Discrimination (LAD)) |
| 599 | Contract/Commercial Transaction |
| 603N | Auto Negligence – Personal Injury (non-verbal threshold) |
| 603Y | Auto Negligence – Personal Injury (verbal threshold) |
| 605 | Personal Injury |
| 610 | Auto Negligence – Property Damage |
| 621 | UM or UIM Claim (includes bodily injury) |
| 699 | Tort – Other |

### Track III - 450 days discovery

| | |
|---|---|
| 005 | Civil Rights |
| 301 | Condemnation |
| 602 | Assault and Battery |
| 604 | Medical Malpractice |
| 606 | Product Liability |
| 607 | Professional Malpractice |
| 608 | Toxic Tort |
| 609 | Defamation |
| 616 | Whistleblower / Conscientious Employee Protection Act (CEPA) Cases |
| 617 | Inverse Condemnation |
| 618 | Law Against Discrimination (LAD) Cases |

## Track IV - Active Case Management by Individual Judge / 450 days discovery

| | |
|---|---|
| 156 | Environmental/Environmental Coverage Litigation |
| 303 | Mt. Laurel |
| 508 | Complex Commercial |
| 513 | Complex Construction |
| 514 | Insurance Fraud |
| 620 | False Claims Act |
| 701 | Actions in Lieu of Prerogative Writs |

## Multicounty Litigation (Track IV)

| | |
|---|---|
| 282 | Fosamax |
| 291 | Pelvic Mesh/Gynecare |
| 292 | Pelvic Mesh/Bard |
| 293 | DePuy ASR Hip Implant Litigation |
| 296 | Stryker Rejuvenate/ABG II Modular Hip Stem Components |
| 300 | Talc-Based Body Powders |
| 601 | Asbestos |
| 624 | Stryker LFIT CoCr V40 Femoral Heads |
| 626 | Abilify |
| 627 | Physiomesh Flexible Composite Mesh |
| 628 | Taxotere/Docetaxel |
| 629 | Zostavax |
| 630 | Proceed Mesh/Patch |
| 631 | Proton-Pump Inhibitors |
| 633 | Prolene Hernia System Mesh |
| 634 | Allergan Biocell Textured Breast Implants |
| 635 | Tasigna |
| 636 | Strattice Hernia Mesh |
| 637 | Singulair |
| 638 | Elmiron |
| 639 | Pinnacle Metal-on-Metal (MoM) Hip Implants |

If you believe this case requires a track other than that provided above, please indicate the reason on page 1, in the space under "Case Characteristics".

**Please check off each applicable category**

☐ **Putative Class Action**      ☐ **Title 59**      ☐ **Consumer Fraud**

☐ **Medical Debt Claim**

# Civil Case Information Statement

## Case Details: ESSEX | Civil Part Docket# L-003283-24

**Case Caption:** THE ESTATE OF KRISTE N MCCARTN  VS SETON HALL UNI

**Case Initiation Date:** 05/14/2024

**Attorney Name:** HELEN J SETTON

**Firm Name:** NESENOFF & MILTENBERG LLP

**Address:** 363 7TH AVE FIFTH FL

NEW YORK NY 10001

**Phone:** 2127364500

**Name of Party:** PLAINTIFF : The Estate of Kristen McCartne

**Name of Defendant's Primary Insurance Company**

(if known): Unknown

**Case Type:** TORT-OTHER

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** YES

**Are sexual abuse claims alleged by: The Estate of Kristen McCartne?** NO

**Are sexual abuse claims alleged by: Donna Dockery?** NO

**Are sexual abuse claims alleged by: Sean McCartney?** NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE

### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO

 **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO

 **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO **Medical Debt Claim?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

05/14/2024                                                                    /s/ HELEN J SETTON
Dated                                                                        Signed