NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ESTATE OF KRISTEN MCCARTNEY, *et al.*, | Civil Action No. 24-6179 (SDW) (JRA) |
| Plaintiffs, | |
| v. | **OPINION** |
| SETON HALL UNIVERSITY, *et al.*, | January 7, 2025 |
| Defendants. | |

**WIGENTON**, District Judge.

Before this Court are two motions to dismiss Plaintiffs Estate of Kristen McCartney, Donna Dockery, and Sean McCartney's complaint (D.E. 1-2 ("Compl.")). The first was filed by Defendants Seton Hall University ("Seton Hall"), Seton Hall's Board of Trustees, Seton Hall's Board of Regents, Cardinal Joseph W. Tobin, and Diane Lynch (D.E. 11), and the second was filed by Defendant Joseph Nyre (D.E. 26). Jurisdiction is proper pursuant to 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1391. This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, the motions to dismiss are **GRANTED**.

I.  **BACKGROUND AND PROCEDURAL HISTORY**

The following facts are drawn from the complaint and accepted as true at this stage. *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). This case arises from the tragic death of Ms. Kristen McCartney while she was a sophomore at Seton Hall. (Compl. ¶ 1.) Ms. Dockery and Mr. McCartney are Ms. McCartney's parents and administrators of her estate. (*Id.* at ¶¶ 13–14, 54.)

On September 20, 2021, Ms. McCartney was discovered unresponsive in a Seton Hall dormitory room and ultimately declared deceased. (Compl. ¶¶ 79–83.) Ms. McCartney had

1

epilepsy, and at the time of her death was known to have about two seizures per year. (*Id.* at ¶¶ 22, 40, 117.) She had submitted documents to Seton Hall informing them of her epilepsy, and her parents had reached out to the school to ensure it knew of their daughter's condition. (*Id.* at ¶¶ 34–35.) Ms. McCartney had suffered two seizures on campus, one on December 1, 2020, and one on January 31, 2021. (*Id.* at ¶¶ 45–46.) She lived in dormitories with roommates while at Seton Hall. (*Id.* at 39–40, 56.)

At the time of Ms. McCartney's death, New Jersey was responding to the COVID-19 pandemic. In June 2020, the state issued "Restart Standards" for its colleges and universities to follow in response to the pandemic. (*Id.* at ¶ 49.) Pursuant to those standards, Seton Hall implemented its university-wide "Restart Plan" in July 2020. (*Id.* at ¶ 50.) Under that plan, Seton Hall provided "designated quarantine and isolation rooms for students who live on-campus and … have symptoms or a positive diagnosis of COVID-19." (*Id.* at ¶ 51.) Seton Hall was also to provide "food service … health monitoring … and other essential services" to students quarantining under the Restart Plan. (*Id.* at ¶ 52.)

On September 10, 2021, Ms. McCartney tested positive for COVID-19. (*Id.* at ¶ 59.) She reported the positive test to Seton Hall and was instructed to isolate in a designated dormitory room from September 10 through September 20. (*Id.* at ¶ 60.) One of Ms. McCartney's roommates had also tested positive for COVID-19 and stayed in the same designated room with Ms. McCartney until September 19, 2021. (*Id.* at ¶¶ 58, 60, 62.) In the evening of September 19, 2021, Ms. McCartney had food delivered to the room, and she had a video call with her usual roommates and planned to have breakfast with them the following morning. (*Id.* at ¶¶ 63, 77.)

Ms. McCartney was permitted to leave the dormitory room at 8:00am on September 20, 2021. (*Id.* at ¶ 76.) She did not check out of the room, and around 11:35am, a Seton Hall official

checked whether the room was vacated. (*Id.* at ¶¶ 78–79.) He found Ms. McCartney there, unresponsive. (*Id.* at ¶ 79.) Authorities including personnel from the South Orange Police Department, the "Robert Wood Medical Center," and Seton Hall's Department of Public Safety arrived and attempted CPR "until 12:19pm, when it was determined that [Ms. McCartney] had passed away." (*Id.* at ¶¶ 79–81.) The police report indicates that Ms. McCartney had a seizure disorder. (*Id.* at ¶ 86.) Around 1:30pm, the then-President of Seton Hall, Joseph Nyre, notified Ms. McCartney's parents of her death. (*Id.* at ¶ 91.)

The next day, Ms. McCartney's parents met with Seton Hall officials, including the Vice President of Student Services, the Dean of Students, and a Public Safety Officer. (*Id.* at ¶ 93.) The officials "deni[ed] any knowledge whatsoever" about the circumstances of Ms. McCartney's death and refused to provide a copy of Seton Hall's COVID-19 protocols. (*Id.* at ¶¶ 93–94.)

Another day later, on September 22, 2021, Ms. McCartney's parents met with more Seton Hall staff members, including President Nyre. (*Id.* at ¶ 96.) Ms. McCartney's parents expressed their dissatisfaction with their meeting the day prior. (*Id.*) In response, President Nyre indicated that

> they would be provided with whatever information and documentation they needed before returning home … that more information would be made available in several weeks, after they received information from the Police and Medical Examiner's Office … that more information was being compiled regarding Kristen's final 36 hours, and that it would be provided to them in writing … that Seton Hall had no intention of keeping information from them, and … that the information would be provided to them in real time.

(*Id.*)

Ms. McCartney's parents sought the autopsy report from the New Jersey State Department of Health for months, ultimately receiving it on May 23, 2022. (*Id.* at ¶ 101.) The report is dated September 21, 2021 and identifies epilepsy as the cause of death. (*Id.*)

3

On November 12, 2021, having received no further information from Seton Hall, Ms. McCartney's parents sent a letter, through counsel, to President Nyre. (*Id.* at ¶ 103.) Therein, they complained about how little information they had received regarding their daughter's death, asked several specific questions regarding the Restart Plan and the circumstances of Ms. McCartney's quarantine, and requested that Seton Hall preserve all related evidence, "providing Seton Hall with actual notice of Plaintiff's potential legal claims." (*Id.* at ¶¶ 103–04.) Seton Hall responded with a letter dated November 30, 2021, stating: "Because this matter is the subject of a pending investigation, Seton Hall University is unable to comply with your requests for further information. Seton Hall University has already provided meaningful information to Ms. McCartney's family at their request. If and when anything changes, we will reach out to you." (*Id.* at ¶ 105.)

By May 14, 2024, Plaintiffs had not received any further information, and they filed a complaint in the Superior Court of New Jersey (Essex County) against Seton Hall, its Board of Trustees, its Board of Regents, Chair of the Board of Trustees and President of the Board of Regents Cardinal Joseph W. Tobin, President Nyre, Seton Hall's Director of Health Services Diane Lynch, and Seton Hall's Director of Housing and Residence Life John Doe. (*Id.* at ¶ 106.)

On May 15, 2024, Seton Hall removed the case to federal court. (D.E. 1.) On June 20, 2024, Seton Hall, its Board of Trustees, its Board of Regents, Cardinal Tobin, and Director Lynch moved to dismiss the complaint. (D.E. 11.) Plaintiffs opposed[1] (D.E. 20), and Defendants replied (D.E. 22). On September 25, 2024, President Nyre moved to dismiss the complaint. (D.E. 26.) Plaintiffs timely opposed (D.E. 28), and President Nyre did not reply.

---

[1] Plaintiffs' opposition brief was untimely. (*See* D.E. 14; D.E. 23.) As detailed below, it was still considered in full and the motions to dismiss are granted on the merits.

## II.    <u>LEGAL STANDARD</u>

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When deciding a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief may be granted, federal courts "must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff," and determine "whether [the] plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer*, 605 F.3d at 229. Determining whether a complaint's allegations are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to show "that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). "Moreover, claims may be properly dismissed on a motion to dismiss for failure to comply with the statute of limitations only if it is apparent from the face of the pleadings that the statutory bar adheres." *Fuqua v. Bristol-Myers Squibb Co.*, 926 F. Supp. 2d 538, 543 (D.N.J. 2013) (citing *Brody v. Hankin*, 145 F. App'x 768, 771 (3d Cir. 2005)).

### III. DISCUSSION

#### A. Counts I and IV — Wrongful Death and Gross Negligence

Counts I and IV are for wrongful death in violation of N.J.S.A. § 2A:31-1 and gross negligence in violation of N.J.S.A. § 2A:62A-9, respectively. (Compl. ¶¶ 109–26; 154–71.) Wrongful death and survivorship claims have statutes of limitations of two years after the decedent's death. N.J.S.A. §§ 2A:31-3 (wrongful death), 2A:15-3(b) (actions brought by administrators for trespass to decedent's person). Personal injury actions have a statute of limitations of two years after "accru[al]" of the cause of action. N.J.S.A. § 2A:14-2(a). Accrual occurs when a plaintiff, "exercising ordinary diligence," would be aware "that he or she was injured due to the fault of another." *Caravaggio v. D'Agostini*, 166 N.J. 237, 246 (2001). As explained below, Plaintiffs were aware of their gross negligence claim, at the latest, by November 12, 2021.

This suit was filed on May 14, 2024, over two years after Ms. McCartney's death and the latest possible accrual of Plaintiffs' gross negligence claim. (D.E. 1-2.) The wrongful death and gross negligence claims are therefore untimely unless an exception to the statute of limitations applies. Plaintiffs argue that three exceptions could apply to this case: substantial compliance, the discovery rule, and equitable tolling. (D.E. 20 at 7.)

#### 1. Substantial Compliance

To "avoid technical defeats of valid claims," substantial compliance with a statute of limitations can excuse an untimely complaint. *Negron v. Llarena*, 156 N.J. 296, 305 (1998). A party asserting substantial compliance must show:

> (1) the lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of [plaintiff's] claim[;] and (5) a reasonable explanation why there was not strict compliance with the statute.

*Id.* (second alteration in original).

Here, the fifth element is dispositive—Plaintiffs have not offered a reasonable explanation for their untimely complaint, so substantial compliance cannot apply. They state that while they sought "information necessary to pursue their legal rights and file this action," they were "misled … into believing that critical information was forthcoming." (D.E. 20 at 10.) According to Plaintiffs, that "fraudulent concealment of the facts … surrounding [Ms. McCartney's] death" explains their untimely filing. (*Id.*)

This explanation is not persuasive given Plaintiffs were represented by counsel, at the latest, by November 12, 2021. (*See* Compl. ¶ 102.) They last heard from Defendants on November 30, 2021, when they received a short, disappointing response to their request for information. (*Id.* at ¶ 105.) Despite believing critical information was forthcoming, Plaintiffs did not follow up during the nearly two years that passed between that response and the end of the limitations period.[2] Relying on that response for so long, well through the limitations period, without further follow-up with Defendants, is not reasonable. Even if Plaintiffs believed further communication would have been futile, they could have filed this lawsuit before the limitations period expired.

Moreover, Plaintiffs' legal conclusion that the information sought was "necessary to … file this action" (D.E. 20 at 10), is clearly unfounded—Plaintiffs filed this lawsuit in May 2024 and do not allege to have received any further information from Defendants before then.[3] They do not explain why Defendants' alleged withholding of information was a barrier to filing during the limitations period but *not* in May 2024.

---

[2] Plaintiffs allege having sent "multiple letters" in the introduction to their complaint (Compl. ¶ 10), but the remainder of their complaint identifies only one letter.

[3] The only information Plaintiffs allege receiving after November 30, 2021 is the autopsy report, which Plaintiffs received from the New Jersey State Department of Health, not Defendants, on May 23, 2022. (Compl. ¶ 101.)

Because Plaintiffs have not offered a reasonable explanation for their delay, an essential element of substantial compliance, evaluation of the remaining factors is unnecessary. It is clear on the face of the pleadings that substantial compliance will not excuse the untimely complaint.

## 2. Discovery Rule

Plaintiffs also argue that their claims are timely by operation of the discovery rule.[4] Under the discovery rule, the statute of limitations does not begin to run with respect to a claim "when the victim is unaware of his injury or does not know that a third party is liable for the injury." *Ben Elazar v. Macrietta Cleaners, Inc.*, 230 N.J. 123, 134 (2017). "When a plaintiff knows he has 'suffered an injury but [does] not know that it is attributable to the fault of another,' the discovery rule tolls the date of accrual as to that unknown responsible party." *Id.* at 134–35 (quoting *Caravaggio*, 166 N.J. at 246). The standard under the discovery rule "is basically an objective one—whether plaintiff 'knew or should have known' of sufficient facts to start the statute of limitations running." *Ben Elazar*, 230 N.J. at 134 (quoting *Caravaggio*, 166 N.J. at 246). "[L]egal and medical certainty are not required for a claim to accrue." *Kendall v. Hoffman-La Roche, Inc.*, 209 N.J. 173, 193 (2012) (delaying accrual until plaintiff knew her injury could have been caused by medication produced by defendants).[5] The requisite knowledge is rather "simply that it is

---

[4] Defendants dispute that the discovery rule can apply to wrongful death actions in New Jersey. (D.E. 11-1 at 6.) The New Jersey Supreme court has "decline[d] to address … whether the discovery rule generally should be applicable to Wrongful Death Act claims." *LaFage v. Jani*, 166 N.J. 412, 420 (2001). This question need not be explored further because, as explained below, even if the discovery rule applies to wrongful death claims, it would not toll the statute of limitations here.

[5] Plaintiffs argue that *Kendall* is inapplicable because it does not include a wrongful death claim. (D.E. 20 at 11.) *Kendall* discusses the discovery rule with respect to tort actions subject to the same two-year statute of limitations as Plaintiffs' gross negligence claim, however. 209 N.J. at 190. Plaintiffs seek application of the discovery rule to their gross negligence claim in addition to their wrongful death claim. (D.E. 20 at 31.) *Kendall* is accordingly relevant to this matter.

Plaintiffs also misrepresent *Kendall*. They describe it as a case in which "plaintiffs were taking a specific medication, and had already been diagnosed with a health condition, and thus were deemed to have sufficient notice of the harm and the source of the harm for their statute of limitations to begin to run." (D.E. 20 at 11.) The *Kendall* plaintiff actually had sufficient notice only *after* learning that the medication could have been causing her harm. 209 N.J. at

possible—not provable or even probable—that a third person's conduct that caused the injury was itself unreasonable or lacking in due care." *Savage v. Old Bridge-Sayreville Med. Grp., P.A.*, 134 N.J. 241, 248 (1993).

Plaintiffs assert that they were reasonably unaware that Defendants could have been at fault for their injury until May 23, 2022, when they received the autopsy report and learned the cause of Ms. McCartney's death. (Compl. ¶ 101; D.E. 20 at 11.) This cannot be true. Plaintiffs must have known of their potential claims on November 12, 2021, when their attorney sent a letter "providing Seton Hall with actual notice of Plaintiff[s'] potential legal claims." (Compl. ¶¶ 102, 182 ("Plaintiffs informed the school early of the potential of future litigation … in the November 12, 2021 letter to the University.").) The letter inquired about the circumstances of Ms. McCartney's quarantine and requested that evidence be preserved (*id.* at ¶¶ 102–03), clearly demonstrating that Plaintiffs knew of "the *possibility* of wrongdoing." *See Savage*, 134 N.J. at 248. That knowledge is sufficient to start the statute of limitations.[6] *Id.* Because Plaintiffs already possessed this knowledge when they received the autopsy report, when they received the report is irrelevant to accrual of their claim. *Id.* ("[K]nowledge of fault does not mean knowledge of a basis for legal liability or a provable cause of action …."). Plaintiffs do not allege to have learned anything else relevant to their claim after September 2021. Accordingly, the discovery rule cannot toll accrual of the statute of limitations here.[7]

---

199. Accrual of her claim was delayed—the same outcome Plaintiffs seek here—until she connected the two and learned that the medication was a potential cause of the harm. *Id.* Finally, Plaintiffs offer in the alternative that *Kendall* applies by exemplifying the discovery rule. (D.E. 20 at 11.) For the reasons stated below, the discovery rule will not toll the statute of limitations here. Unlike in *Kendall*, Plaintiffs here knew of their harm *and* its potential cause around the same time, and they failed to file their complaint within two years of obtaining that knowledge.

[6] It is immaterial whether Plaintiffs had sufficient knowledge for their claim to accrue before sending their letter. The complaint is untimely whether the claim accrued on or before November 12, 2021.

[7] Plaintiffs' reliance on *LaFage*, 166 N.J. at 412, is misguided. (D.E. 20 at 12 (mistakenly referring to the 2001 case as a "2021 decision").) Plaintiffs incorrectly state that the New Jersey Supreme Court determined that a spouse's

Plaintiffs make one more argument with respect to the discovery rule—they argue in the alternative that the statute of limitations has still not accrued because they "need the promised investigative report in order to truly determine who is at fault." (D.E. 20 at 12.) As established above, Plaintiffs have had sufficient knowledge for their claim to accrue—knowledge of their injury and Defendants' potential liability—since November 12, 2021. The fact that they have not received the investigative report does not change that. *See Savage*, 134 N.J. at 248. Moreover, "the specific identity of a potential defendant is not a requirement for commencing an action." *Apgar*, 588 A.2d 380, 383 (N.J. 1991). To the extent Plaintiffs did not know whom to sue, they could have filed against fictitious parties. The fictitious party rule applies to the exact circumstances that Plaintiffs allege: when plaintiffs do not know a defendant's true name, "process may issue against the defendant under a fictitious name" as long as "the plaintiff exercised due diligence to ascertain the defendant's true name before and after filing the complaint." *See DeRienzo v. Harvard Industries, Inc.*, 357 F.3d 348, 353 (3d Cir. 2004) (citing N.J. Ct. R. 4:26-4). Had Plaintiffs done so, their effort to obtain the investigative report would be a relevant exercise of due diligence to identify the defendants. Plaintiffs were clearly aware of this practice; they included Seton Hall's Director of Housing and Residence Life as a John Doe defendant. (Compl. ¶ 21.) In light of Plaintiffs' knowledge of the fictitious party rule and, by November 12, 2021, their potential legal claims, there is no basis on which the discovery rule should delay accrual of the statute of limitations here.

---

wrongful death claim accrued "when the spouse *learned* about the cause of death, *rather than the date of death*." (*Id.* at 13.) The court actually abstained from deciding when the spouse's claim accrued; it held only that the complaint was untimely regardless of whether the claim accrued on the date of death or the date that the spouse affirmatively learned it could have been due to medical malpractice. *Lafage*, 166 N.J. at 420. Plaintiffs also argue that "according to *LaFage*," their claim did not accrue until "the date that [they] received a copy of the Autopsy Report." (D.E. 20 at 13.) This argument—that accrual should be based on the date of receipt of the autopsy report—was decisively rejected in *LaFage*. 166 N.J. at 418, 420 (upholding decision that claim accrued, at the latest, at time before receipt of autopsy report). No facts here dictate a different outcome; in both cases, the plaintiffs knew of their harm and its potential cause over two years before filing a complaint. *See id.*

10

### 3. Equitable Tolling

Plaintiffs also argue that the statute of limitations should be "equitably tolled due to the circumstances created and perpetuated by Defendants in this action." (D.E. 20 at 13.) Under New Jersey law, equitable tolling is permissible when a plaintiff has been "induced or tricked by his adversary's misconduct into allowing the filing deadline to pass" or prevented from asserting his rights "in some extraordinary way." *Freeman v. State*, 788 A.2d 867, 879–80 (N.J. App. Div. 2002) (internal citations omitted), *cert. denied*, 796 A.2d 895 (N.J. 2002); *see Rowell v. Stecker*, 698 F. App'x 693, 695 (3d Cir. 2017). Equitable tolling also requires diligence from the party seeking it; "[e]ven in fraud cases, … a plaintiff cannot defer the running of the statute by sleeping on his rights or by his own negligence." *Kyle v. Green Acres at Verona, Inc.*, 207 A.2d 513, 520 (N.J. 1965); *see Rowell*, 698 F. App'x at 696.

> Plaintiffs state that
>
> Defendants assured Plaintiffs that an investigation was taking place, … promised further information would be provided in real time when it existed[, and] acted in bad faith … by fraudulently concealing critical information about [Ms. McCartney's] death in an attempt to bar Plaintiffs from pursuing their legal rights against them.

(D.E. 20 at 15.) It is not clear, nor do Plaintiffs explain, how Defendants' failure to provide them with information "induced or tricked" them into letting the statute of limitations lapse. Plaintiffs did not have to await the investigation results to file a complaint; they were able to file a complaint in May 2024 without receiving any further information from Defendants. They did not know what the investigation would reveal, and there is no indication that it would have rendered litigation unnecessary. Plaintiffs are not generally entitled to information from their anticipated adversaries before litigation, and Defendants are not alleged to have done anything to make Plaintiffs believe otherwise. Plaintiffs claim that they "still do not possess sufficient information to determine the

full extent of Defendants' liability, and the individuals involved" (D.E. 20 at 15), but as explained above, knowledge of the precise extent of liability is not necessary for a claim to accrue, and Plaintiffs could have availed themselves of the fictitious party rule. Plaintiffs have not shown that Defendants' conduct or any extraordinary circumstances induced them into non-compliance with the statute of limitations, so they cannot benefit from equitable tolling. *See Rowell*, 698 F. App'x at 696 (declining to apply equitable tolling when "[t]here [was] no evidence that the defendants [were] to blame for the plaintiffs' untimely filing").

Plaintiffs also cannot benefit from equitable tolling because they have not acted diligently—they offer no reasonable explanation for their delay, even if it was induced in part by Defendants. Plaintiffs do not explain their failure to follow up with Defendants as the filing deadline approached, or why they waited an additional eight months after September 2023 to file. Accordingly, the statute of limitations will not be equitably tolled. *See Kyle*, 207 A.2d at 520; *Rowell*, 698 F. App'x at 695 n.5 (finding that lack of diligence for equitable tolling purposes also supported lack of substantial compliance with statute of limitations). Because the complaint was filed after the expiration of the statute of limitations as to Counts I and IV, those claims must be dismissed.

### B. Count II — Breach of Contract

Count II alleges that Seton Hall, its Board of Trustees, and its Board of Regents breached a contract with Ms. McCartney. (Compl. ¶¶ 127–40.) Plaintiffs seem to allege two different contractual relationships—an implied one "based merely on the fact that [Ms. McCartney] was a student at Seton Hall (D.E. 20 at 16; Compl. ¶¶ 130), and an express one based on the Restart Plan (Compl. ¶ 132; D.E. 20 at 18).[8]

---

[8] Plaintiffs also state that "Defendants were responsible to uphold the By-Laws of the University, and protect students on its property." (Compl. ¶ 131.) They do not identify any provision of the By-Laws explicitly holding Defendants

Under New Jersey law, "'the relationship between a private university and its students can not be described either in pure contract or associational terms,' and the role of the court in reviewing such contract claims is limited." *Doe v. Princeton Univ.*, 790 F. App'x 379, 385 (3d Cir. 2019) (quoting *Mittra v. Univ. of Med. & Dentistry of N.J.*, 719 A.2d 693, 696–97 (N.J. App. Div. 1998)). Attendance or payment of tuition at a university does not automatically create a contract. *See, e.g.*, *Keles v. Bender*, Civ. No. 17-1299 (ES) (JAD), 2021 WL 568105, at *4 (D.N.J. Feb. 16, 2021), *aff'd,* No. 21-1497, 2022 WL 840311 (3d Cir. Mar. 18, 2022) ("The university … operates under standards that do not have their origins in any bargain struck with students."); *Mittra*, 719 A.2d at 89 (quoting *Napolitano v. Trs. of Princeton Univ.*, 453 A.2d 263, 272 (N.J. App. Div. 1982)) ("'[T]uition … might, in some instances, represent a contractual consideration.' … We nevertheless emphasized the 'necessity for independence of a university ….'").

The standard applied to alleged contracts between universities and their students "depends on the context." *Powell v. Seton Hall Univ.*, Civ. No. 21-13709 (WJM) (JSA), 2022 WL 1224959, at *9 (D.N.J. Apr. 26, 2022). When the university is not acting in a specialized role, and its challenged actions do not "go to the core of the university's pedagogical mission," a traditional contractual analysis applies. *See Dougherty v. Drew Univ.*, 534 F. Supp. 3d 363, 383 (D.N.J. 2021) (declining to apply special rules to "standard-fare contract claims regarding fees" because university was acting "more as a building proprietor or business entity than an academic institution").

Alternatively, when a university makes an "administrative or business judgment," courts will not intervene absent "a showing of bad faith, arbitrariness or lack of prompt notice." *Beukas v. Bd. of Trs. of Fairleigh Dickinson Univ.*, 605 A.2d 776, 781–82 (N.J. 1991). Courts have applied

---

responsible for student safety, so the Court understands this reference to the By-Laws to be in support of the implied contract.

this standard to universities' choices to move to remote learning during the pandemic. *See, e.g.*, *Dougherty*, 534 F. Supp. 3d at 375–76 (applying *Beukas* standard to separate claim regarding virtual learning); *Fittipaldi v. Monmouth Univ.*, Civ. No. 20-5526 (MAS) (ZNQ), 2021 WL 2210740, at *6 (D.N.J. June 1, 2021).

Finally, when a university exercises academic judgment or makes a decision concerning student discipline or dismissal pursuant to university policy, courts "typically limit[] their review … to a consideration of whether (1) the university substantially departed from its own rules and regulations, (2) the procedures employed by the university were fundamentally fair, and (3) the university's decisions were supported by sufficient evidence." *Powell*, 2022 WL 1224959, at *9; *see also Fittipaldi*, 2021 WL 2210740, at *6 (describing this standard as relevant to "student-university academic discipline or performance disputes"); *Keles*, 2021 WL 568105, at *6 (applying substantial departure standard "[g]iven … the academic nature of the decision"); *Mucci v. Rutgers*, Civ. No. 08-4806 (RBK), 2011 WL 831967, at *19 (D.N.J. Mar. 3, 2011) (inquiring only into reasonable notice and fairness when university decision was an "issue[] of academic performance"); *Mittra*, 719 A.2d at 697 (applying substantial departure standard to academic dismissal); *Beukas*, 605 A.2d at 781 (contrasting standards used in cases "involv[ing] the exercise of *academic*, rather than *administrative* or business judgment").

The events here have nothing to do with academic or disciplinary judgment; Seton Hall's decision to implement the Restart Plan with respect to Ms. McCartney is much closer to the "administrative or business judgments" to which courts have applied the *Beukas* standard. *Dougherty*, 534 F. Supp. 3d at 375–76; *Fittipaldi*, 2021 WL 2210740, at *6. The question is thus whether Defendants acted in bad faith, arbitrarily, or without notice. Plaintiffs do not allege that they did. (D.E. 20 at 21 (declining to "explore whether Defendants' Restart Plan was 'arbitrary,

14

made in bad faith, or lacking fair notice'").) The alleged breach concerns only Defendants' conduct leading up to Ms. McCartney's death. (Compl. ¶¶ 127–53.) Plaintiffs' claims regarding bad faith are limited to Defendants' interactions with Ms. McCartney's family after her death (*id.* at ¶¶ 174–85), but those are not part of the alleged breach here. Because Plaintiffs have not alleged that Defendants breached an agreement with Ms. McCartney in bad faith, arbitrarily, or without notice, their breach of contract claim must be dismissed.

## C. Count III — Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count III, Plaintiffs assert another contractual claim: breach of the implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing is part of every contract in New Jersey. *Fields v. Thompson Printing Co.*, 363 F.3d 259, 270 (3d Cir. 2004). Without a valid contract, there can be no claim for a breach of the implied covenant of good faith and fair dealing. *Noye v. Hoffmann-La Roche, Inc.*, 570 A.2d 12, 14 (N.J. Super. App. Div. 1990). "[A] claim for breach of the duty of good faith and fair dealing requires a showing of 'bad motive or intention,' … though at the pleading stage all that is required is an allegation of bad faith." *Alin v. Am. Honda Motor Co.*, Civ. No. 08-4825 (KSH), 2010 WL 1372308, at *11 (D.N.J. Mar. 31, 2010) (quoting *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1130 (N.J. 2001)). It also must be factually separate from any breach of contract claim. Where "the two asserted breaches basically rest on the same conduct," there "can be no separate breach of an implied covenant of good faith and fair dealing." *Wade v. Kessler Inst.*, 798 A.2d 1251, 1261 (N.J. 2002); *see also Doe v. Princeton Univ.*, 30 F.4th 335, 348 n.16 (3d Cir. 2022) (noting that "implied covenant claim" based on "same fact" pled in support of contract claim would fail).

Here, as explained above, Plaintiffs have not necessarily established the existence of a contract as required for a claim for breach of the implied covenant of good faith and fair dealing. Even if they had, their claim would fail for two separate reasons.

First, Count III lacks an essential element of the claim—that Defendants had "bad motive or intention." *Wilson*, 773 A.2d at 1130. Nowhere in Count III do Plaintiffs suggest that the alleged breaches—of the Restart Plan or of an implied contract with Ms. McCartney—were committed with bad motive or intention. Plaintiffs insist in their opposition that they pled "in the Complaint that the Defendants acted with bad motives/intentions and/or deception or evasion." (D.E. 20 at 26.) Their only support, however, is that the complaint included a separate count for fraudulent concealment. (*Id.*) The fraudulent concealment claim was not incorporated into Count III (*id.* at ¶¶ 141 (repeating and realleging all *above* paragraphs), 172 (beginning of fraudulent concealment count)), and more importantly, its allegations concern different conduct from those in Count III. The fraudulent concealment claim relates only to Defendants' contact with Plaintiffs following Ms. McCartney's death, but the alleged breach in Count III is Defendants' conduct *before* the death. (*See id.* at ¶¶ 146 (discussing "depart[ure] … from the[] promises … in the Restart Plan), 149 ("[Ms. McCartney's] death was a … consequence of Defendants' … breaches [sic] of its implied contract with [Ms. McCartney].").) The fraudulent concealment is not alleged to have been in violation of any contract. Any bad faith pled in connection with fraudulent concealment is irrelevant to the alleged breach of contract, and in any event, "the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Commw. of Pa. ex. rel Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988). Because Plaintiffs did not plead bad motive or intention in connection with the breach of contract, their claim of a breach of the implied covenant of good faith and fair dealing cannot succeed.

Count III also fails because it is based on the same allegations as the breach of contract claim in Count II.  *See Wade*, 798 A.2d at 1261.  The two counts are nearly identical.  Aside from a few differences in punctuation, capitalization, and the order of the allegations, the only difference between Counts II and III is that each contains a sentence that the other does not.  Unique to Count II is the sentence "Defendants had an express agreement with [Ms. McCartney] through its [sic] Restart Plan to provide adequate 'health monitoring' and 'essential services'" (Compl. ¶ 132), and unique to Count III is "Defendants clearly departed substantially from their promises to students and the state of New Jersey in the Restart Plan" (*id.* at ¶ 146).  Both counts clearly "rest on the same conduct."  *Wade*, 798 A.2d at 1261.  Plaintiffs insist only in their opposition that the claims are "based on distinct facts" because the contract claim is based on Defendants' conduct before Ms. McCartney was discovered, and the implied covenant claim is based on Defendants' conduct thereafter.  (D.E. 20 at 26–27.)  This misrepresents the complaint.  Counts II and III both contain allegations regarding alleged breaches of the Restart Plan or an implied contract leading to Ms. McCartney's death, and neither refers to Defendants' conduct thereafter.  Inaccurate statements to the contrary in an opposition brief cannot change this.  *Zimmerman*, 836 F.2d at 181.  Accordingly, Count III must be dismissed.

**D.  Count V — Fraudulent Concealment**

Plaintiffs also plead fraudulent concealment against all Defendants.  To state a claim for fraudulent concealment in New Jersey, "a plaintiff must allege: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) a reasonable reliance thereon by the other person; and (5) resulting damages."  *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 305 (D.N.J. 2009) (quoting *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997)).  Fraudulent

concealment must be pled "with particularity" consistent with Federal Rule of Civil Procedure 9(b). *See Arcand*, 673 F. Supp. at 305.

Plaintiffs seem to allege a few different material misrepresentations: President Nyre's statement that Seton Hall would provide information to them in real time (Compl. ¶¶ 175–76), Seton Hall's November 30, 2021 response to Plaintiffs' letter (*id.* at ¶¶ 180–81), and Defendants' overall failure or refusal to provide information regarding the death (*id.* at ¶¶ 174, 182–86).[9]

None of the alleged misrepresentations in Count V could support a claim for fraudulent concealment. "Statements as to future … events, … or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong." *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J. 1998); *see also Com. Ins. Servs., Inc. v. Szczurek*, Civ. Nos. 05-3536, 05-3565 (JBS), 2006 WL 8457151, at *8 (D.N.J. Jan. 6, 2006). President Nyre's indication that "Seton Hall had no intention of keeping information from [Plaintiffs and that] information would be provided to them in writing in real time" (Compl. ¶ 175) and the letter in which Seton Hall told Plaintiffs "[i]f and when anything changes, we will reach out to you" (*id.* at ¶ 180) both make representations about something happening in the future. President Nyre's statement and Seton Hall's response to Plaintiffs' letter are therefore not misrepresentations for purposes of fraudulent concealment.

Defendants' alleged refusal to provide information also does not support the fraudulent concealment claim. Silence can be a misrepresentation for fraudulent concealment purposes only if there is a duty to disclose. *See Alexander*, 991 F. Supp. at 435 n.14; *Lighting Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993). Count V makes no allegations regarding duty. Nor do

---

[9] Plaintiffs assert in their opposition that the Restart Plan was also a misrepresentation supporting fraudulent concealment. (D.E. 20 at 32–33.) The Restart Plan was not pled as such in the complaint, however, so it will not be considered in connection with this claim. *Zimmerman*, 836 F.2d at 181.

the complaint's preceding paragraphs, "repeat[ed] and reallege[d]" in Count V, assert any duty of disclosure owed by Defendants to Plaintiffs.  (Compl. ¶ 172.)  The complaint's only allegations that can be construed as asserting a duty describe a duty to keep students safe, not a duty to disclose information to students or anyone else.  (*See, e.g.*, *id.* at ¶¶ 36, 52, 110, 120.)  Plaintiffs' arguments in their opposition regarding a duty to disclose cannot correct this deficiency in their complaint.  *Zimmerman*, 836 F.2d at 181.  In view of the heightened pleading standard for a fraudulent concealment claim, Defendants' withholding of information cannot support a fraudulent concealment claim absent an articulated duty to disclose.

Count V also fails on at least one other ground.  Reasonable reliance on the alleged misrepresentations is an essential element of fraudulent concealment, and Plaintiffs do not address this element at all in Count V.  As explained above, Plaintiffs' last alleged communication with Defendants was on November 30, 2021, and they do not allege any further contact before September 20, 2023, the earliest possible expiration of the statute of limitations for some of their claims.  (Compl. ¶ 105.)  Plaintiffs offer no explanation as to the reasonableness of relying on Defendants' representations for such a long time, and this failure to plead an essential element of fraudulent concealment is fatal to their claim.

Because Plaintiff has failed to plead at least two essential elements of fraudulent concealment, the remaining elements need not be addressed.[10]  Count V must be dismissed.

---

[10] The parties also dispute whether the statute of limitations for a fraudulent concealment claim has lapsed.  (D.E. 11-1 at 9–10; D.E. 20 at 31, 38–39; D.E. 26-1 at 3.)  Their arguments are based on a two-year statute of limitations; no party mentions the possibility that the applicable statute of limitations could be six years instead of two.  *Sweeney v. Trinity Highway Prods., LLC*, Civ. No. 16-765 (SDW) (LDW), 2016 WL 7325471, at *2 n.1 (D.N.J. Dec. 16, 2016) (declining to apply two-year statute of limitations to fraudulent concealment claim).  The Court need not reach the statute of limitations issue as to fraudulent concealment because Plaintiffs' failure to plead the elements of the claim is dispositive.

## IV.  CONCLUSION

For the reasons set forth above, the two motions to dismiss are **GRANTED**, and Plaintiffs' Complaint is **DISMISSED WITHOUT PREJUDICE**.  Plaintiff shall have thirty (30) days to file an amended complaint.  Failure to timely file an amended complaint may result in the dismissal of this matter with prejudice.  An appropriate order follows.


/s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:  Clerk
cc:  Parties
    José R. Almonte, U.S.M.J.